BANCITALY CORPORATION, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 59674, 59461, 59462, 59464, 59466, 59491–59493.
Promulgated April 30, 1936.

---

[1] Proceedings of the following petitioners are consolidated herewith: Transamerica Mortgage Holding Company; Transamerica Insurance Holding Company; Transamerica Public Utilities Holding Corporation; Transamerica Corporation; Inter-Continental Corporation; Transamerica Service Company; and Transamerica Bank Holding Company.

*John Enrietto, Esq., Charles D. Hamel, Esq.*, and *M. Goldwater, Esq.*, for the petitioners.

*Brooks Fullerton, Esq.*, and *James K. Polk, Esq.*, for the respondent.

OPINION.

VAN FOSSAN: Respondent determined a deficiency of $3,669,809.32 in the 1928 income tax of Bancitaly Corporation and, on June 13, 1931, made a jeopardy assessment thereof under section 273 (a) of the Revenue Act of 1928. Against each of the other seven petitioners he is asserting transferee liability for that deficiency. The petitions set forth three assignments of error, two of which, one relating to foreign taxes paid by petitioner and the other to profit on short sales, have been settled by stipulations which will be given effect in the recomputation under Rule 50. The remaining assignment relates to the amount of profit derived by Bancitaly Corporation from sales of stock of the Bank of America, National Association. In its tax return for 1928 petitioner showed a total profit derived from such stock sales of $21,734,894.60 and it paid a tax of $5,885,960.11. In determining the deficiency, respondent increased this profit to $41,475,996.84. In its original petition petitioner protested, as to this issue, the addition of the sum of $19,741,102.24 to income. In its amended petition petitioner alleged that respondent erred by including the sum of $41,475,996.84 in taxable income and asserted that it (petitioner) erroneously computed and reported its profit from such sales in its tax return at $21,734,894.60, alleging the correct profit to be $2,768,195.04. Petitioner, accordingly, prays a finding of an overpayment in the amount of $2,101,239.84. On the brief, the petitioners admit a gain of $6,326,460.96. In his answer to the amended petition in Docket No. 59674, respondent alleges that he used an incorrect cost basis for the shares sold by the Bancitaly Corporation, which resulted in an understatement of the gain in the deficiency notice; that he improperly computed the gain to Bancitaly Corporation from sales of certain shares in the Bank of America (State Bank), by treating said sales as sales of shares in the Bank of America, National Association; and he makes claim to any additional deficiency that may result from the correction of these alleged errors.

As to the transferee liability of the seven petitioners other than the Bancitaly Corporation, for any deficiency found to be due from the latter, the parties have stipulated as follows:

It is hereby agreed by the parties hereto, by their respective counsel of record, that the seven petitioners herein, other than the Bancitaly Corporation, are

jointly and severally liable at law and in equity as transferees of Bancitaly Corporation for the unpaid Federal income tax, if any, with interest thereon as provided by the applicable Internal Revenue statutes, finally redetermined to be due from Bancitaly Corporation for the calendar year 1928. The Board, upon the final redetermination of said unpaid Federal income tax, and said interest thereon, of said Bancitaly Corporation, may enter an order in the case of each of the above seven petitioners redetermining the joint and several liability of each of said seven petitioners to be the amount, including interest as aforesaid, redetermined to be due from said Bancitaly Corporation for the year 1928.

It is further agreed, that effective upon entry by the Board of its order of redetermination in said seven transferee cases, said seven petitioners waive the restrictions, if any, contained in the applicable Internal Revenue Act or Acts on assessment and collection of the amount, including interest as aforesaid, so redetermined, plus interest thereon as provided by law.

The proceedings were submitted largely upon written stipulations of fact of considerable length and complexity, which are a part of the record in the cases and are not set out herein *in toto*. Our statement of the facts is limited to those which we deem essential to a clear understanding of the issues.

The respondent's motion, filed on October 24, 1934, to strike the amended petition in Docket No. 59674 from the record, on the ground that the same states a new cause of action and was filed more than two years subsequent to the payment of the tax and more than 60 days subsequent to the mailing of the notice of deficiency, which motion was taken under advisement at the hearing on the merits of the case, is denied.

## I.

Bancitaly Corporation, herein called the petitioner, was organized in 1918 under the laws of New York, to acquire a controlling interest in the East River National Bank of New York City, which was, in 1923, consolidated with the Bowery Bank, also of New York City, to form the Bowery & East River National Bank.

In the taxable year the petitioner sold 280 shares in the Bank of America, a New York State bank, and realized a profit of $112,162.84.

## II.

At the time of the consolidation, which will be hereinafter outlined, the petitioner owned 7,540, of a total of 15,000 outstanding, shares in the Commercial Exchange Bank; 20,432, of a total of 40,000 outstanding, shares in the Bowery & East River National Bank; and 34,519, of a total of 65,000 outstanding, shares in the Bank of America. These shares had been acquired at various times and at various prices. Their total cost to the petitioner was $25,645,992.86.

All of the shares in the Bank of America were acquired in the early months of 1928. From the beginning of the negotiations for the acquisition of these shares it was the main object and purpose to consolidate the three aforementioned banks, under national banking laws, into one large banking institution under petitioner's control. A plan of consolidation was formulated. The plan, in its broadest outlines, contemplated that the Commercial Exchange Bank and the Bank of America would be converted into national banking associations; that trust powers would be obtained for them; and that they and the Bowery & East River National Bank would then be consolidated as the Bank of America, National Association. It also contemplated a much larger capital for the consolidated bank and the organization of a securities affiliate.

On March 20 and 21, 1928, respectively, the Commercial Exchange Bank and the Bank of America filed applications with the chairman of the board of directors of the Federal Reserve Bank of New York for permission to exercise trust powers, to be effective upon conversion into national banks. The Bank of America had a large trust department doing a $215,000,000 business, involving 1,879 trust accounts, and the inclusion of this department in the consolidation was a vital necessity, if the proposed consolidated bank was to be successful in the highly competitive Wall Street district. The officials of the said Federal Reserve Bank advised the petitioner that approval of the applications for trust powers would be withheld until it signed a written agreement that all of the shares in the consolidated bank would be distributed to individual ownership within a reasonable period. Petitioner consulted counsel about the restriction thus imposed upon it by the Federal Reserve officials and was advised that a consolidation without trust powers might invalidate every trust held by the consolidating banks. Thereupon, and on March 23, 1928, petitioner addressed a letter to the Federal Reserve Agent at New York City, in which it agreed "that we will distribute to individual ownership all of this capital stock of the new merged bank * * * within a period of six months, unless such time be further extended by you." On the same day, the Federal Reserve Bank approved and transmitted the applications to the Federal Reserve Board in Washington, stating in its transmittal letter:

The principal question which our directors raised concerning the granting of these trust powers had to do with the distribution of the stock of the contemplated institution, to be known as the Bank of America National Association. It has been the view of our directors that control of this stock should not be retained in a holding company. Upon this point we now have assurances from the Banc-italy Corporation, as indicated by a letter, a copy of which is attached, that all of the stock of the new merged bank will be distributed to individual ownership.

On March 24, 1928, the Federal Reserve Board approved the applications for trust powers, effective upon conversion of the banks into national banking associations.

The Comptroller of the Currency authorized the nationalization of the Commercial Exchange Bank, as the Commercial Exchange National Bank, and the Bank of America, as the Bank of America, National Association, and permitted them to begin business as national banks on March 26, 1928.

On March 27, 1928, an agreement of consolidation was executed by the officers and directors of the three consolidating banks. The agreement provided that the three banks would be consolidated under the charter and name of the Bank of America, National Association; that the consolidated bank would receive all of the assets and assume all of the liabilities of the consolidating banks, subject to certain conditions not important here; and that the capital stock of the consolidated bank should be $25,000,000 divided into 1,000,000 shares of the par value of $25 each. The agreement further provided that the said 1,000,000 shares in the consolidated bank would be distributed as follows: 260,000 shares to the shareholders of the Bank of America on the basis of 4 new shares for one old share; 288,000 to the shareholders of the Bowery & East River National Bank on the basis of 7.2 for one; 72,0000 to the shareholders of the Commercial Exchange National Bank on the basis of 4.8 for one; 372,000 to be offered for subscription and/or sold to the shareholders of the consolidating banks, at the price of $110 per share, on the basis of six-tenths of a share for each share in the consolidated bank they would receive under the agreement; and 8,000 to be offered at not less than $110 per share to the officers and employees of the consolidated bank, under an officers' and employees' stock purchase plan. The consolidation was to be effective, under the terms of the agreement, when ratified and confirmed by vote of the holders of two-thirds of the stock of each of the consolidating banks and approved by the Comptroller of the Currency.

On April 4, 1928, an agreement was executed, with the approval of the directors of the consolidating banks, by a committee of shareholders of the said banks and the Bank of America, National Association, as depositary. On the same day, the committee sent a letter to each of the shareholders of the consolidating banks setting forth the details of that agreement, and we quote below, so far as material here, one such letter which is typical of the others:

In order to facilitate and further enlarge the business conducted for the benefit of those who hold shares in the Consolidated Bank it is also proposed to organize a so-called "securities corporation" upon the model of the companies which for a number of years have been in successful operation by the shareholders of several of the large national banks. * * *

It is proposed to form the securities corporation * · * * under the name of Bankameric Corporation * * * with but one class of stock, all the shares of which will carry full voting rights.

This corporation will be organized with the view of having every shareholder of the Consolidated Bank own the beneficial interest in a share of the Bankameric Corporation for each share of stock held in the Consolidated Bank * * *. The shareholders of the Consolidated Bank are, therefore, being accorded the opportunity to subscribe for a beneficial interest in the stock of Bankameric Corporation at the subscription price of Fifteen dollars ($15) per share for each such share of Consolidated Bank stock owned or subscribed for. Appropriate arrangements have been made so that the beneficial interest in the shares of the Bankameric Corporation will be transferable only in conjunction with the transfer of the shares of the Consolidated Bank. This arrangement is necessary and highly desirable in order to secure identity of ownership of the Consolidated Bank and of the Corporation.

* * * All stock of the Corporation will be issued in the names of the respective subscribers and will be held by The Bank of America National Association as Depositary for the Committee. The Consolidated Bank stock certificates of such subscribers will be appropriately endorsed to evidence their ownership in shares of stock of the Corporation, which endorsement will include provisions whereby when transfers are made of the Consolidated Bank stock the Committee, or the said Depositary, will be authorized to transfer such shares of the Corporation into the name of the transferee.

As a shareholder in Commercial Exchange National Bank in New York you are entitled under the foregoing Plan to the following for each share you now hold (subject to the qualification below set forth with respect to fractional shares) :

A. Four and eight-tenths (4.8) shares ($25 par) in the Consolidated Bank in exchange for each share ($100 par) which you now hold.

B. The right to subscribe to an additional two and eighty-eight hundredths (2.88) shares (being an amount equal to six-tenths of the shares you will receive under Paragraph "A") in the Consolidated Bank at $110 per share, which requires payment of_____ $316. 80

C. The right to subscribe to an amount of shares in the Bankameric Corporation at $15 per share for the four and eight-tenths (4.8) shares received under "A" and for the two and eighty-eight hundredths (2.88) shares subscribed for under "B", or a total of seven and sixty-eight hundredths (7.68) shares, which requires a payment of_____ 115. 20

Total new payment for each share of Commercial Exchange National Bank in New York stock of $100 par value now held_____ $432. 00

*       *       *       *       *       *       *

In order to facilitate the carrying out of the Plan and the issuance of additional stock of the Consolidated Bank and of stock in the Bankameric Corporation, provision is made in the Agreement whereby the Committee will, without charge, handle all such subscriptions for shareholders. You may become a party to the Agreement and give the Committee the necessary authority by depositing on or before April 28th, 1928 with the * * * Depositary for the Committee your present stock certificate duly endorsed in blank. The Committee will, immediately upon receipt, forward to you an assignable Receipt with an assignable Stock Subscription Warrant.

The Receipt will entitle you or your assignees to receive immediately after the completion of the consolidation a certificate for four and eight-tenths (4.8) shares in the Consolidated Bank for each share now held by you and deposited with the Committee, which certificate for Consolidated Bank shares will be endorsed with an appropriate statement to the effect that the holder is entitled to the beneficial interest in a like number of shares of the Bankameric Corporation. The holder of the Receipt will be required to pay, before being entitled to receive the said certificate, an amount at the rate of $15 for each of said shares of the Bankameric Corporation; or in other words, an amount equal to $72 for each share of stock of $100 par value which you now hold.

*      *      *      *      *      *      *

The Stock Subscription Warrant will entitle you or your assignees to subscribe for additional shares in the Consolidated Bank in an amount equal to six-tenths of the number of shares of the Consolidated Bank called for by the above mentioned Receipt, and for a like number of shares of the Bankameric Corporation. The subscription price for the additional Bankameric Corporation stock will be $15 per share. Upon exercising his rights the subscriber will be entitled to receive a certificate for Consolidated Bank shares endorsed with a statement that the holder thereof is entitled to the beneficial interest in a like number of shares of Bankameric Corporation.

*      *      *      *      *      *      *

Your attention is particularly called to the fact that in order to take advantage of the Plan described in this letter and in the Agreement, you must deposit your present certificates of stock duly endorsed in blank so that they will be received prior to the close of business on Friday, April 20th, 1928. Deposits may be made by delivering or mailing such certificates to The Bank of America National Association, Depositary, 44 Wall Street, New York City, N. Y. If the plan for the consolidation is approved at the meetings of the shareholders of the three consolidating banks to be held on April 26th, 1928, payment on both the Receipts and the Warrants must be made not later than April 27th, 1928, and the stock certificates (and Scrip Certificates) will be issued as soon thereafter as the consolidation is actually completed. Such payments must be made in New York funds at the office of The Bank of America National Association, Depositary, 44 Wall Street, New York City.

No Receipts or Warrants can be issued by the Committee to any shareholder until such shareholder has become a party to the enclosed Agreement by the deposit of his stock in the manner above prescribed.

The entire plan is contingent upon the effective carrying out of the proposed consolidation and upon the other conditions mentioned in the Agreement, and if for any reason the consolidation is not completed by June 26th, 1928, or if for any other reason in the discretion of the Committee it is considered desirable not to proceed further with the Plan, all deposited stock and any payments made will be returned to the holders of the Receipts and Warrants upon surrender thereof.

The success of the Plan seems assured by the fact that the holders of approximately two-thirds of the stock in each of the consolidating banks have agreed to deposit the same with the Committee. All of the stock of the Bankameric Corporation and the additional shares of Consolidated Bank stock now offered to shareholders have been underwritten without cost to the Bankameric Corporation or to the Consolidated Bank.

Also, on April 4, 1928, petitioner entered into an agreement with the said shareholders' committee, whereby it agreed to subscribe for

and purchase, or find purchasers for, at $110 per share, such of the 372,000 shares in the consolidated bank as were not subscribed for through the exercise of rights by shareholders of the consolidating banks and such of the 8,000 shares as were not subscribed for by the officers and employees of the consolidated bank. Petitioner did not purchase any shares in the consolidated bank pursuant to this agreement.

Bankameric Corporation was organized on April 20, 1928, under the laws of New York.

On April 19 and 20, 1928, the petitioner deposited its shares in the consolidating banks with the depositary designated in the agreements and received therefor assignable deposit receipts.

Sometime between April 19 and 27, 1928, and in all probability on April 20, there were issued by the shareholders' committee to the petitioner, or its nominees, as provided in the agreement of April 4, assignable stock subscription warrants for additional shares in the consolidated bank and a like number of shares in the Bankameric Corporation. The rights represented by these warrants expired on April 27, 1928. On that day, the petitioner exercised its rights to subscribe for 192,827.48 shares in the consolidated bank and a like number of shares in the Bankameric Corporation, and it deposited with the depositary $28,924,198.80, cash, in payment for the said shares and for 321,378.8 shares in the Bankameric Corporation previously subscribed for. It also paid $201.60 for 72/100 shares in the consolidated bank and in the Bankameric Corporation, to complete whole shares.

By April 20, 1928, more than two-thirds of the total outstanding shares in each of the consolidating banks had been deposited under the consolidation and April 4 agreements. On April 26, 1928, the shareholders of each of the consolidating banks ratified the consolidation. On April 28, 1928, the Comptroller of the Currency issued his certificate approving the consolidation.

No shares in the consolidated bank were issued prior to April 30, 1928. On that day the consolidated bank, through the shareholders' committee, issued to petitioner, or its nominees, certificates for 514,207 shares of its stock. Each certificate, on the reverse side thereof, contained a "Receipt for Stock of The Bankameric Corporation" executed by the Bank of America, National Association, Depositary, acknowledging that the said depositary "has received from the registered holder of the within certificate of stock * * *, a certificate or certificates for a number of shares (hereinafter called the 'Deposited Shares') of the stock of the Bankameric Corporation, equal to the number of shares of The Bank of America National Association represented by the within certificate", and set forth that "The Deposited Shares are not separately transferable, but this receipt

and all rights and interest represented hereby may be transferred on the books of the Depositary * * *, upon any transfer of the shares of stock of the Bank of America National Association represented by the within certificate."

As early as March 13, 1928, petitioner's directors appointed a committee to make arrangements for disposing of the shares which it was contemplated petitioner would receive if the consolidation, for which a plan already had been formulated, was carried out. On April 2, 1928, the committee submitted a plan of disposition to petitioner's executive committee, and the said plan was adopted. The plan contemplated disposing of 300,000 or more shares in the consolidated bank to the shareholders of the petitioner and of the Bank of Italy National Trust & Savings Association, and of 200,000 shares to National Bankitaly Co., for sale through the bond department of the Bank of Italy National Trust & Savings Association. Under the plan, the 300,000 or more shares were to be offered to the shareholders of the petitioner and of the Bank of Italy National Trust & Savings Association, upon the basis of one such share for each 24 shares owned, at and for the price of $225 per share, purchases to be made on or before April 20, 1928, and to be paid for on that day, or, at the option of the purchasers, on the installment plan. The agreement of sale executed by purchasers on the installment plan contained the following provision:

It is agreed that in the event that the Buyer shall fail to make any payment as herein provided when the same becomes due and such default shall continue for a period of sixty (60) days, all rights of the Buyer under this contract shall cease and terminate, and the Seller agrees to refund to the Buyer all the installments or principal paid hereunder. Upon such refund of said installment payments, the said Seller will be relieved of all further obligation to sell or transfer the stock herein mentioned, and will be released from all liability with regard to this contract, and the said Seller may use the power of attorney executed as a part of this transaction by the Buyer, and sell the said stock or the non-negotiable receipt evidencing the same, in the name of the said Buyer as the Buyer's attorney in fact.

The shareholders of the petitioner and of the Bank of Italy National Trust & Savings Association exercised their options, under the aforesaid plan, to purchase from petitioner 321,860 shares in the consolidated bank. Within the year 1928 subscriptions for 137,136 shares were completely paid and certificates for that number of shares were delivered to the subscribers, and subscriptions for 47,688 shares were canceled and all payments made thereon returned to the subscribers. At the close of the year, the petitioner held uncompleted sales contracts for 137,036 shares, upon which there remained to be paid $19,032,463.07. Petitioner owned and held that number of shares, and no more, at the end of the year. Said uncompleted sales contracts were completed or canceled as follows: 60,714 shares were

paid for and 50,078 were canceled in 1929, 16,536 shares were paid for and 9,265 were canceled in 1930, 20 shares were paid for and 88 were canceled in 1931, and 335 shares were canceled in 1932. All payments previously made were returned to canceling subscribers.

In the taxable year the petitioner purchased, at various times and at varying prices, additional shares in the consolidated bank, as follows: 45,450, in two transactions, from the Capital Co., its wholly owned subsidiary and tax affiliate, at a total cost of $11,822,951.73, which was also the cost of the said shares to the Capital Co.; 40,418 in 91 or more open market dealings through brokers, at a total cost of $7,836,153.25; and 84,198, in one transaction, from the National Bankitaly Co., at a cost of $18,944,550. Thus, with the 514,207 shares which came to it through the consolidation and exercise of stock rights, the petitioner owned 684,273 shares in the taxable year, the total cost of which $93,174,048.24. By the close of the year it had disposed of all but 137,036 shares, which it was holding for delivery under uncompleted sales contracts with its shareholders and the shareholders of the Bank of Italy National Trust & Savings Association. Of the 547,237 shares disposed of, 69,876 were sold to the Capital Co., in 10 transactions; 4,724 were sold through brokers in the open market, in 20 transactions, for $927,093.79; 50,500 were sold to the National Bankitaly Co., in two transactions, for $9,750,-000; an additional 150,000 were sold to the National Bankitaly Co., in one transaction, for $33,750,000; 137,137 were sold to the shareholders of the petitioner and of the Bank of Italy National Trust & Savings Association, in an undisclosed but large number of transactions, for $30,855,825; 5,000 were sold to the Ameritalia Corporation of Milan, Italy, in one transaction, for $916,173.30; and 130,000 were distributed to petitioner's shareholders as a dividend. All open market purchases and sales were made for the purpose of supporting the market price of the shares.

The respondent determined that the petitioner realized a gain of $41,475,996.84 from the aforesaid sales of shares in the consolidated bank and from the sale of the 280 shares in the Bank of America, mentioned in the fore part of this opinion. In arriving at that determination, he computed gain or loss upon each separate sale. He determined the basis for each lot of shares sold by the first in, first out rule, charging earliest sales against earliest purchases, and as though all sales were made from a common location. He further determined that the cost basis for the 137,036 shares which petitioner held at the end of the year, measured by the cost of the last 137,036 shares acquired, is $30,104,318.98.

(a) The first question for consideration is whether the respondent is right in computing gain or loss upon each separate sale of shares in the consolidated bank or whether, as petitioner contends, the

entire 684,273 shares owned during the year must be regarded as a single asset, the gain or loss remaining in suspense until the entire cost is recovered, except the cost of the 69,876 shares involved in the intercompany sales to the Capital Co. and the 130,000 shares distributed as a dividend. The petitioner argues that the dispositions of the 514,207 shares, which were acquired under the consolidation agreement in exchange for shares in the consolidating banks and through the exercise of stock rights, were not a series of individual, separate, sporadic sales, but rather they were but parts of a conscious course of action, determined on in response to demands of the Federal Reserve officials, which coalesced the disposition and acquisition of the investment in the consolidated bank into one inseparate, indivisible transaction; and that its dealings in the later acquired 170,066 shares were wholly incidental and part of the necessary machinery for effecting an orderly disposition of that investment.

Collectively these shares represented petitioner's investment in the consolidated bank. That this investment, or a large portion of it, was disposed of piecemeal is an inevitable conclusion upon the facts. It is well settled that where property is acquired *en bloc* or *en masse* and subsequently sold in lots or parcels, a computation of gain or loss must be made upon each separate sale and the result reported in the tax return and not held in abeyance or suspense until the entire cost of the property is recovered. *Santa Maria Gas Co.*, 10 B. T. A. 1412; *Weser Bros. Inc.*, 12 B. T. A. 1394; *American Industrial Corporation*, 20 B. T. A. 188; and *O. H. Himelick*, 32 B. T. A. 792. There is nothing in this record that requires or justifies any different treatment of this petitioner's sales of shares in the consolidated bank, even though it be said that these sales were made in pursuance of a course of action forced upon petitioner by Federal Reserve officials. The petitioner's promise to the Federal Reserve officials, to distribute to individual ownership all of the capital stock in the consolidated bank, exacted by those officials as a condition precedent to the approval of the application, made for and in behalf of the consolidated bank, for a permit to exercise trust powers, was not a part of the transactions that produced the gains in controversy; they were entirely different matters. Each sale was a completed transaction unaffected by anything that had transpired before or would transpire later. Each resulted in a taxable gain or a deductible loss.

The doctrine of *Burnet* v. *Logan*, 283 U. S. 404, which petitioner invokes, has no application here, even under the circumstance that the future payments on or realization from the 137,036 shares held at the end of the year, for delivery under uncompleted sales contracts, were not predictable with anything approaching accuracy.

*Burnet* v. *Logan* involved a single transaction in which certain shares were sold for cash and the right to receive future payments. The Supreme Court held that as the future payments "were wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty", the right thereto had no ascertainable fair market value and, therefore, that all payments received by the taxpayer should be treated as a restoration of capital until the total thereof equaled the capital base, and then any payments in excess of that base should be treated as gain, if, as, and when received. Here there is no attempt to tax any gains arising out of transactions involving uncertain payments of indeterminate sums of money. The gains in controversy were produced by completed transactions, in which the considerations were paid in cash or its equivalent at the times they occurred. That some part or all of the 137,036 shares might have to be sold in a later year at a loss is not a valid reason for deferring recognition of the gains realized from sales completed within the year, which is the ultimate of petitioner's contention. "A taxpayer may be in receipt of income in one year and not in another. The net result of two years, if combined in a single taxable period, might still be a loss; but it has never been supposed that that fact would relieve him from a tax on the first, or that it affords any reason for postponing the assessment of the tax until the end of a lifetime, or for some other indefinite period, to ascertain more precisely whether the final outcome of the period, or of a given transaction, will be a gain or a loss." *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359.

We hold that respondent was correct in determining gain or loss upon each separate sale of shares in the consolidated bank.

(b) The cost of the old shares which petitioner exchanged was $25,645,992.86. For these and $4,820,682, cash, it received 321,378.8 new shares carrying the beneficial ownership of a like number of shares in the Bankameric Corporation and stock subscription warrants evidencing rights to subscribe for 192,827.48 additional new shares at $110 per share, and a like number of shares in the Bankameric Corporation at $15 per share. The parties agree that the exchange was a nontaxable transaction within section 112 (b) (3) of the Revenue Act of 1928. The total cost of the securities received in exchange is, therefore, $30,466,674.86. Petitioner exercised its stock rights, paying $24,103,516.80 for 192,827.48 new shares and the beneficial ownership of a like number of shares in the Bankameric Corporation, and it purchased a fractional share at a cost of $201.60. Thus the total cost of these 514,207 new shares is $54,570,393.26, and this is admitted by both parties. They differ, however, as to how this cost is to be apportioned between the shares for the purpose of com-

puting gain or loss upon sales. Petitioner contends that each of the 514,207 shares takes a pro rata part of the cost, which is $106.12534. Respondent, as we understand it, now contends that the cost of the securities received in exchange should be apportioned between the 321,378.8 new shares and the stock subscription warrants, upon the basis of their respective fair market values; and that the cost of the new shares acquired through the exercise of stock rights is the sum of that portion of the cost of the old shares apportioned to the stock subscription warrants and the subscription price paid. He did not make such an apportionment in the notice of deficiency, but assigned the entire cost of the securities received in exchange to the new shares, and nothing to the stock subscription warrants, and held that the cost of the shares acquired through stock rights was the subscription price paid; and this is one of the grounds upon which he lays claim to an increased deficiency.

We think that the respondent's present position, as we have stated it above, is correct. The exchange of the old shares and cash for new shares and stock subscription warrants, and the exchange of the warrants and cash for additional new shares, were two entirely separate and independent transactions. The first was required by the consolidation plan, the second was of petitioner's own choosing. Nothing in the consolidation and deposit agreements or any prior event compelled a particular course of action with respect to the warrants. At its option, the petitioner could have sold them, permitted them to lapse, or exercised the rights under them. To ignore the receipt of the warrants and the exercise of the rights thereunder and say that there was but one transaction, in which the old shares and $28,924,-198.80, cash, were exchanged for 514,206.28 new shares (0.72 share purchased separately), which is the premise of petitioner's apportionment of cost, is to ignore what was actually done. Questions of taxation must be determined by viewing what was actually done. *Weiss* v. *Stearn*, 265 U. S. 242. It is only in those instances where the evidence warrants the conclusion that the steps taken or acts done were never intended to be of substantive effect that disregard of form is justified, *Ralph F. Chandler Shipbuilding Co.*, 22 B. T. A. 5; and it can hardly be said here that the exchange of the old shares and cash for new shares and warrants and the exercise of the rights under the warrants were not steps of substantive effect.

The warrants were unquestionably property, as much so as the new shares that they accompanied in the exchange. They were negotiable, were being dealt in on securities exchanges, and had a substantial value when issued. Under the circumstances, they and the accompanying 321,378.8 new shares must share their aggregate cost of $30,466,674.86. Upon the evidence, we find that the fair market value of the warrants, when received, was $72 per right to subscribe

for one share of stock, and that the fair market value of the new shares, when issued, was $293 per share. Upon the basis of these values, the cost of the securities received in exchange is apportioned $24,456,810.23 to the 321,378.8 new shares, and $6,009,864.63 to the warrants for 192,827.48 rights. Adding the latter figure to the subscription price of $24,103,516.80 paid, the cost of the 192,827.48 new shares acquired through the exercise of the rights under the warrants is $30,113,381.43. The 72/100 share purchased separately to complete a whole share has a cost basis of $201.60, the purchase price paid therefor.

(c) The new shares were deposited by petitioner in several depositaries. Within these depositaries, the 321,378.8 new shares acquired in exchange for the old were commingled with the 192,827.48 new shares acquired through the exercise of rights. As indicated in the preceding paragraph, the shares within one of these categories have a different basis or cost than those within the other. During the year, the petitioner acquired 170,066.72 new shares, at various times and at varying prices, and these were likewise deposited in the several depositaries and commingled there with earlier acquired shares. As to each disposition of new shares, delivery was made out of the shares in a particular depositary. The shares delivered can not in every instance be identified as having been acquired at particular times and prices.

The parties agree that the foregoing circumstances necessitate the use of the first in, first out rule, to determine the basis or cost of each lot of shares sold, but they differ in several respects as to how the rule should be applied.

First, the respondent applied the rule as though every disposition of new shares was made from a common location. The petitioner contends that the rule should be so applied as to give effect to the fact that the shares delivered from an individual depositary could have come only from the shares available at that particular depositary. The petitioner is right. The shares delivered are presumed to be the shares that were actually sold. The shares delivered from a particular depositary necessarily must have been out of the shares available at that depositary and can not, by any arbitrary application of the first in, first out rule, be presumed to have been out of the shares available in another depositary located perhaps, as one depositary was, 3,000 miles across the continent. Every lot of shares disposed of by the petitioner can be identified, from the stipulated facts, as out of shares available at a particular depositary, and the cost of each of these lots is ascertainable only from the costs of the shares available at that particular depositary. As between the shares at each depositary, in so far as it is impossible to identify the particular units delivered, the first in, first out rule should be applied so

that the earliest deliveries are considered to have been made from the earliest receipts at that depositary.

Second, the respondent contends, and this is an additional ground for his claim to an increased deficiency, that, in applying the first in, first out rule, the 321,378.8 new shares received in exchange for the old should be treated as having been acquired before the 192,827.48 new shares acquired through the exercise of stock rights. The problem is more or less one of practical administration, because, while all were received by the petitioner on the same day, the shares in the two categories have different bases. Under the decision in subdivision (b), the cost of the first is equivalent to $76.09964 per share, while the cost of the second is equivalent to $156.16748 per share. Article 58 of Regulations 74 provides that "When shares of stock in a corporation are sold from lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchases of such stock." This is a valid and reasonable regulation, *Todd* v. *Commissioner*, 72 Fed. (2d) 998; and, when applied to the facts of this case, we think the respondent's claim should be allowed. While all of the shares were received by the petitioner at the same time, it can not be said that they were all purchased at one time. The 321,378.8 shares received in exchange were acquired through the deposit of the old shares on April 20, 1928; and the 192,827.48 shares were acquired through stock rights exercised on April 27, 1928.

Third, the respondent applied the rule as though the shares disposed of were the old, and not the new, shares, that is, by charging the earliest dispositions of new shares against the earliest purchases of old shares. The petitioner contends that each new share received in a nontaxable exchange for old shares takes a pro rata part of the cost of the old shares and that all are deemed to have been acquired at the same time—the date of the exchange. Subject to the decision in subdivision (b) of this opinion, which ascribes a part of the cost of the old shares to the stock subscription warrants also received in exchange, the petitioner is correct. *Christian Von Gunten*, 28 B. T. A. 702; affd., 76 Fed. (2d) 670; and *Helvering* v. *Stifel*, 75 Fed. (2d) 583. The latter case is on all fours with the case at bar; and the Commissioner's contention there was precisely what it is here. The court answered it as follows:

The Board of Tax Appeals held the contrary in *von Gunten* v. *Commissioner*, *supra*, in which the taxpayer sold stock that he had received in exchange for shares of another corporation purchased at divers dates at varying prices. It is not necessary in the pending case to decide whether the first in, first out rule should be applied when the stock given in exchange consists of the shares of a single corporation; for, in the pending case, the situation is affected by the fact that the shares given in exchange consisted of shares of two separate corpora-

tions, and, were acquired in the case of both corporations at varying prices at different times. We are of the opinion that under such circumstances there is no practicable way of determining the cost of the shares received in exchange than that which was adopted by the Board of Tax Appeals. The properties owned by the two earlier companies were taken over by the new company in the reorganization, and shares of stock of the latter necessarily represented undivided interests in the combined assets, which prior to the merger had been represented by the shares of the two separate corporations respectively. The shares of the Oil Company which Stifel sold in 1929 did not represent either the shares of the Refining Company or the shares of the Gas Company alone, but a combination of both, and hence any calculation of the cost of the shares sold, based upon the original cost of the shares of only one of the two companies, would be fallacious. The cost of both must be considered, and a correct result can be obtained only by ascertaining the average cost of all the shares, in exchange for which the new stock was acquired.

The respondent concedes that these authorities are against him, but he argues long and earnestly in his brief, that they are wrong and in conflict with decisions interpreting other sections of the statute not bearing here. We are satisfied that these authorities are correct and stand upon them.

Fourth, the respondent now contends, and this is a further ground for his claim to an increased deficiency, that, in applying the first in, first out rule, 5,000 shares purchased by petitioner at various dates between June 25 and July 18, 1928, at a total cost of $916,173.30, should be disregarded, because these shares were purchased, not for petitioner's own account, but for the Ameritalia Corporation, of Milan, Italy, and in due course were delivered to that company at cost. In the notice of deficiency, the respondent determined that petitioner purchased these shares for its own account and thereafter sold them to Ameritalia Corporation. The evidence does not establish error in that determination. The affirmative claim of the respondent as to this item, is, therefore, denied.

### III.

In 1928 all of the shares in National Bankitaly Co. were held by a trustee. The beneficial interest in said shares was held by the shareholders of the Bank of Italy National Trust & Savings Association, which was evidenced by endorsement on the share certificates of the latter company. The shares in one of these corporations could not be transferred independently of the shares in the other.

Also, in 1928, 36 percent of petitioner's shares was owned by persons who owned 44 percent of the shares in the National Bankitaly Co. and the Bank of Italy National Trust & Savings Association, though not in the same proportions.

All but one of petitioner's directors were directors of the National Bankitaly Co. A. P. Giannini and L. M. Giannini, his son, were

chairman of the board and president, respectively, of the National Bankitaly Co., and president and executive vice president, respectively, of petitioner.

All three of the above mentioned corporations were part of the group of corporations managed by A. P. Giannini, who directed the affairs of all of them, nothing important being done without his approval. In intercorporate dealings between corporations managed by Giannini, written contracts were seldom, if ever, employed, and all transactions were handled in the most informal manner.

As stated in subdivision II of this opinion, it was a part of the plan for disposing of the shares in the consolidated bank, adopted April 2, 1928, to dispose of 200,000 shares to National Bankitaly Co. to be sold through the bond department of the Bank of Italy National Trust & Savings Association. In previous years, the latter had rendered underwriting services to the petitioner frequently at a loss, and the purpose of the present arrangement was, therefore, twofold: first, to assist the petitioner in disposing, pursuant to its agreement with the Federal Reserve Bank, of the shares in the consolidated bank, and, second, to allow the Bank of Italy National Trust & Savings Association to have all profits resulting from the sale of 200,000 shares for more than $225 per share.

Pursuant to the aforesaid arrangement, the petitioner's executive committee, on April 2, 1928, adopted the following resolution:

WHEREAS, it will be for the benefit of this corporation that 200,000 shares of the capital stock of The Bank of America N. A., or any part thereof, and all of the 300,000 or more shares of the capital stock of said The Bank of America N. A. offered to stockholders of this corporation and/or Bank of Italy National Savings and Trust Association which are not purchased by said stockholders, be sold to the National Bankitaly Company at its option, at and for the sum of $225.00 per share, in order that said National Bankitaly Company may deliver said shares to the Bond Department of Bank of Italy National Trust and Savings Association for resale to clients, prospective clients and friends of said Bank of Italy National Trust and Savings Association and the institutions allied therewith, now therefore,

BE IT RESOLVED, that this corporation sell to National Bankitaly Company 200,000 shares of the capital stock of The Bank of America National Association, or any part thereof, and all of the 300,000 shares or more of said The Bank of America National Association offered to the stockholders of this corporation and/or Bank of Italy National Trust and Savings Association which are not purchased by said stockholders, all of said shares to be sold to said National Bankitaly Company at its option, at $225.00 per share for the purpose of resale through the Bond Department of Bank of Italy National Trust and Savings Association as aforesaid, at such price as the said Bond Department may fix. Payment for said shares sold to National Bankitaly Company to be made in cash, and payment to be evidenced by a non-negotiable receipt providing for the delivery of the certificates representing said shares on October 1, 1928.

A. P. Giannini agreed with J. A. Bacigalupi, president of the Bank of Italy National Trust & Savings Association and director and vice

president of the National Bankitaly Co., that it was understood that the petitioner "would take the stock back if they did not sell it."

On April 10, 1928, the directors of the National Bankitaly Co. adopted the following resolution:

RESOLVED, by the Board of Directors of NATIONAL BANKITALY COMPANY; that

WHEREAS, Bancitaly Corporation, upon completion of the consolidation of the Bowery and East River National Bank and The Bank of America, under the name of The Bank of America National Association, will be entitled to five hundred thousand (500,000) shares of the capital stock of The Bank of America National Association; and

WHEREAS, the said Bancitaly Corporation is required to sell said shares; and

WHEREAS, it is deemed for the best interests of this corporation to purchase as many of said Five hundred thousand (500,000) shares as may be available at and for the purchase price of two hundred and twenty-five dollars ($225.00) per share, in order to resell the same through the Bond Department of Bank of Italy National Trust and Savings Association; and

WHEREAS, three hundred thousand (300,000) of said shares are to be offered by said Bancitaly Corporation to the stockholders of Bank of Italy National Trust and Savings Association and/or Bank of Italy at the ratio of one (1) share of The Bank of America N. A. for each twenty-four (24) shares held by the said stockholders in Bank of Italy National Trust and Savings Association and/or Bancitaly Corporation, pursuant to the terms and conditions of a certain letter dated April 3, 1928, issued by said Bancitaly Corporation;

Now, THEREFORE,

BE IT RESOLVED, that of said five hundred thousand (500,000) shares of the capital stock of said The Bank of America National Association this corporation purchase from Bancitaly Corporation all of the two hundred thousand (200,000) shares not to be offered by said Bancitaly Corporation to its stockholders and/or to the stockholders of the Bank of Italy National Trust and Savings Association as aforesaid, and such of the three hundred thousand (300,000) shares to be offered said stockholders as are not subscribed for by said stockholders, all at and for the price of Two hundred and Twenty-five (225.00) per share; payment for said shares to be made in cash, and to be evidenced by a non-negotiable receipt providing for delivery of the certificates representing said shares on October 1, 1928.

BE IT FURTHER RESOLVED, that when said shares have been acquired the same be sold through the Bond Department of Bank of Italy National Trust and Savings Association for the purpose of resale among prospective clients and friends of Bank of Italy National Trust and Savings Association, upon such terms and conditions as may be hereafter fixed by the President of this corporation, and that the President or any Vice President of this corporation be and they are hereby authorized to enter into an agreement with the said Bancitaly Corporation with regard to the purchase of said shares of stock hereinbefore mentioned, in conformity with this resolution, and to do all things necessary or incidental to the consummation of the general plan set forth in this resolution.

As the shareholders of the petitioner and of the Bank of Italy National Trust & Savings Association subscribed for a larger number (321,860) of shares than was expected, the number of shares delivered to the National Bankitaly Co. was reduced to 150,000.

The certificates for these 150,000 shares, 2,175 in number, the largest of which were for 100 shares, were delivered on May 5, 1928, the transfer agent issuing the certificates in the name of National Bankitaly Co.

The total consideration involved in this transaction was $33,750,-000. It was paid on May 7, 1928, by canceling $23,720,441.21 face amount of petitioner's 6 percent interest-bearing notes in possession of the National Bankitaly Co., and delivery by National Bankitaly Co. of its 6 percent interest-bearing note for $10,029,558.79 to the petitioner. In 1928 all obligations between these two corporations were evidenced by interest-bearing notes, and all interest due from one to the other was timely paid or credited.

On its books the petitioner credited its asset account designated "Bank of America—Investment A/c 25.00 Par—Bank Stocks" with $15,559,950. This was at the rate of $103.733 per share for the 150,000 shares, which was the average book price for all of the shares carried in that account. It did not at the time, however, account for any gain, though the transaction was recorded as "Sale to Bond Dept", but it credited the apparent book gain of $18,190,-050 ($33,750,000−$15,559,950) to an account called "Reserve—Bank Stocks", the journal voucher supporting the entry containing the explanation "Profit not taken—150,000 B of A sold to Bond Dept." The National Bankitaly Co., on its books, charged the $33,750,000 which it paid to an account designated "Bank of America Stock a/c #1", the journal voucher supporting the entry containing the explanation "Purchase from Bankitaly Corp. 150,000 shs Bank of America at 225. Debit Bond Dept Bank of America at 225. Debit Bond Dept Bank of Italy (B of A Underwriting)." This account bore the notations "B of I—Open a/c" and "Carried for B of I", referring to the Bank of Italy National Trust & Savings Association. Subsequently the National Bankitaly Co. purchased an additional 4,065 shares in the consolidated bank in the open market and charged the cost thereof to this account. Also, it charged this account with interest on funds invested in the shares carried therein, at the rate of 6 percent per annum, and credited it with the proceeds of all sales of consolidated bank shares and with all dividends received on those shares. On December 30, 1928, following a credit entry of $18,944,550 for 84,198 shares transferred to petitioner, which transaction will be outlined later, the credit balance of $2,128,083.70 in the account was transferred to accounts payable, presumably to the credit of the Bank of Italy National Trust & Savings Association.

In 1928 the National Bankitaly Co. received cash dividends from the consolidated bank of $93,372.75 on 82,998 shares and $94,722.75 on 84,198 shares. At least 80,133 of the said 82,998 and 84,198 shares

were a part of the 150,000 shares involved in the above described transactions. It used the cash so received and made no accounting therefor to the petitioner, though apparently it ultimately accounted for the dividends to the Bank of Italy National Trust & Savings Associaion. Also, it reported the said dividends in its 1928 income tax return as nontaxable income.

Of the aforesaid 154,065 shares (150,000 from petitioner and 4,065 purchased in the open market), the National Bankitaly Co. sold 69,867 to June 11, 1928. It sold none for less than $225 per share. On that day, shares in the consolidated bank opened on the San Francisco Curb Exchange at $250, dropped to a low of $148, and rallied to close at $207. On only one day thereafter in 1928, June 14, did the market again reach as high as $225 per share. After June 11, the National Bankitaly Co. did not sell a single share, to the expiration (September 23, 1928) of the six-month period within which petitioner agreed, with the Federal Reserve Bank, to distribute to individual ownership all of the shares in the consolidated bank. On September 22, 1928, it transferred to petitioner 84,198 shares, being all of the unsold shares in its hands. On that day, the fair market value of these shares was $195 per share. In the interim, faced with the problem of complying with its agreement with the Federal Reserve Bank, the petitioner, on September 19, declared a property dividend of 130,000 shares, which was distributed on or about October 16, 1928. On September 27 petitioner sold 50,000 shares to the National Bankitaly Co. at and for the price of $195 per share, and the latter distributed the shares to its shareholders as a dividend.

The total consideration involved in the transfer by the National Bankitaly Co. to petitioner of the aforesaid 84,198 shares was $18,944,550, which was $225 per share, or $30 per share more than the then fair market value. It was paid by petitioner by transferring to the National Bankitaly Co. $15,000,000 face amount of bonds of the Bankitaly Mortgage Co., upon which there was accrued interest of $170,833.33, and crediting the balance of $3,773,716.67 against notes of the National Bankitaly Co. owned by petitioner, thus reducing the face of those notes to that extent. The Bankitaly Mortgage Co. was a wholly owned subsidiary of the National Bankitaly Co., and the bonds were part of an original issue of $20,000,000, all of which was acquired by National Bankitaly Co. in June 1928. Said bonds were guaranteed as to principal and interest by the National Bankitaly Co. The 84,198 shares were entered on the petitioner's books at $16,418,610, equivalent to $195 per share, and the difference between that figure and $18,944,550, or $2,525,940, was charged to the account "Reserve Bank Stocks", the same account that carried the apparent

book gain upon the original transfer of the 150,000 shares to the National Bankitaly Co. On October 31, 1928, the credit balance in this reserve was transferred to profit and loss account as a gain from sales of securities. On December 31, 1928, the 84,198 shares were revalued on petitioner's books at $103.73 per share, and surplus was charged with the amount of the write-down, $7,684,751.46. The National Bankitaly Co. recorded the transaction on its books by crediting $18,944,550 to "Bank of America Stock a/c #1", the same account to which it had charged the consideration of $33,750,000 paid to petitioner upon receipt of the 150,000 shares originally, and charging appropriate asset accounts with the face amount of the bonds and accrued interest thereon and reducing its bills payable to the petitioner.

The respondent determined that petitioner's transfer of 150,000 shares to the National Bankitaly Co. and the transfer by said company to petitioner of 84,198 shares were separate transactions; that upon the sale the petitioner realized a gain of $22,123,956.25; and that the petitioner's basis for computing gain or loss upon subsequent dispositions of the 84,198 shares is $18,944,550, or $225 per share, the consideration paid therefor to the National Bankitaly Co. The petitioner contends that the two transactions are legally related and interdependent, and together constitute a final disposition of 65,802 shares at $225 per share, not an independent sale of 150,000 shares at $225 per share and an independent and unrelated purchase of 84,198 shares at the same price.

We think the respondent must be sustained. Here, as appears in the corporate records, we have an offer by petitioner to sell an amount of 200,000 shares certain and an undetermined amount additional, all at $225 per share, the amount taken to be at the option of the purchaser. Next we have a resolution by the purchaser to buy the certain amount of 200,000 shares and any additional shares available under the terms of the offer. We do not find these resolutions to be ambiguous. The phrase "at its option", coupled with the phrase "or any part thereof", both of which appear in the resolution of the seller (petitioner) but do not appear in the resolution of the buyer, gave the purchaser the right to buy any amount it might elect of the quantity available. Other provisions bound petitioner to sell such quantity. For reasons not here material, the amount actually sold was reduced to 150,000 shares.

The petitioner, by endorsement on stock certificates, executed muniment of title to 150,000 shares; it yielded possession of the property; it received the consideration in the equivalent of cash—the National Bankitaly Co.'s note for $10,029,558.79, given as part consideration, being ultimately satisfied in settlements of later transactions between

the two companies. The new certificates were issued to and in the name of the National Bankitaly Co.; it received all of the dividends on such of the shares as it continued to own; it disposed of more than 65,000 shares at times and prices in its own discretion and without reference to the petitioner. For aught the record shows, the National Bankitaly Co. never made any accounting to the petitioner, such as would stamp the transaction as a consignment or merchandising arrangement, and none was ever requested. The National Bankitaly Co., and not the petitioner, exercised complete dominion of ownership over the property.

Petitioner contends that the sale was subject to an understanding that petitioner would take back at the price of $225 per share all of such stock as the purchaser was unable to resell. It points to the testimony of two of petitioner's witnesses to this effect, and to the fact that it actually reacquired a large amount of the stock at the named price ($225 per share) when the market was much below this figure. Thereupon it bases its contention that the disposition of 150,000 shares and the reacquisition of 84,198 shares constituted but one transaction, that of the sale of 65,802 shares. Neither the resolution of the seller nor that of the purchaser made any suggestion that the sale was on consignment or was a merchandising arrangement. Nor was reference made to any agreement to take back or buy back the stock. There is nothing on the corporate minutes of either party supporting the suggestion now advanced by petitioner. It is entirely possible, moreover, to give full faith to the testimony and yet disagree with the conclusion to be drawn therefrom. The practical effect of the testimony is that there existed an oral commitment of the president of petitioner to protect the purchaser against loss on unsold shares. But assuming such oral understanding and passing without discussion the question of the legal effect of such a commitment by a corporate officer, unsupported by corporate action, it does not follow that there was not an absolute sale by petitioner of the 150,000 shares. The weight of the evidence clearly supports the view that the sale by petitioner was absolute. Petitioner had a vital personal interest in seeing the shares distributed within the time set by the Federal Reserve Board. The situation was novel in other respects. Petitioner, in making sales direct to its stockholders, obligated itself to relieve any purchasers of their stock if they defaulted on installment payments and to refund payments already made. Such a commitment, however, did not prevent a sale from being a reality if payment was made. In the case of the sale of the 150,000 shares payment was made.

Likewise, the evidence as to the purchase by petitioner of 84,198 shares supports the conclusion that it was a separate transaction,

carrying its own legal consequences. There is nothing inharmonious between the concept of an absolute or completed sale and an agreement to repurchase later, at the option of the original purchaser, shares remaining in its hands. The record evidence of the contract clearly demonstrates that it was one of sale made at the election or option of the seller. The delivery of the property and payment of the consideration discharged the bilateral obligations of the contract. Petitioner does not suggest that there was anything in the contract binding the National Bankitaly Co. to resell to the petitioner, that being entirely optional with the National Bankitaly Co. Assuming a rising market, conceivably the National Bankitaly Co. could have kept the 84,198 shares in the hopes of further profit and no claims or demands of the petitioner would have availed.

We conclude and find that there was a definite and completed sale of the 150,000 shares by petitioner and an independent repurchase of 84,198 shares by petitioner. Though there was, in a certain sense, a relationship between the two transactions, it was not such a relation as to make the two transactions one in law or to make the original sale incomplete or conditional. See *Jacob M. Dickinson, Jr., et al., Executors*, 18 B. T. A. 790; *Daisy M. Ward*, 29 B. T. A. 1251.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*

---

ARUNDELL, dissenting: To hold that the petitioner made a profit of some $18,000,000 on the disposition of 150,000 shares of Bank of America stock to the National Bankitaly Co. is to glorify the form and forsake the substance. It was necessary that the shares of Bank of America be promptly disposed of to meet the requirements of the Federal Reserve officials. The transaction here involved was undertaken to that end. The evidence seems clear to me that petitioner was obligated to take back at the stated sales price of $225 per share those shares which the National Bankitaly Co. could not sell. Within a few months and within the taxable year 84,198 shares were returned at the price of $225 agreed upon, although the market price at the time was $195 per share. It is unbelievable that this repurchase would have taken place unless there was a distinct obligation resting on the petitioner to reacquire on such terms. The transaction should be viewed as a whole. So viewed, the profit should be computed only on those shares definitely and finally disposed of. Taxes are real and the profit should be real that is taxed.

SMITH agrees with this dissent.