Metropolitan Commercial Corporation and Subsidiary Company, v. Commissioner.
Metropolitan Commercial Corp. v. Commissioner
Docket No. 79013.
United States Tax Court
T.C. Memo 1963-116; 1963 Tax Ct. Memo LEXIS 226; 22 T.C.M. (CCH) 533; T.C.M. (RIA) 63116; April 25, 1963
Peter J. George, Esq., 225 Broadway, New York, N. Y., for the petitioner. Edward H. Hance, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax of the petitioner and its subsidiary company for the taxable years 1946 and 1947 in the respective amounts of $27,190.01 and $31,465.83. Some of the issues raised by the pleadings have been conceded by the petitioner. The issues remaining for decision are (1) whether the transfer in 1946 by petitioner of 1,000 shares of stock of The William Schollhorn Company to its subsidiary, National Insurance Company, constituted a taxable sale of such stock (as contended by the respondent), or whether such Schollhorn stock was merely transferred as collateral security for the purchase, for $250,000, of 50,000 shares of Securities Corporation General stock from Louisville Fire & Marine Insurance Co. (resulting in no taxable gain as contended by the petitioner); (2) whether the transfer by the petitioner in 1946, at *228 an agreed price, of 14,286 shares of Securities Corporation General stock, subject to the right of the buyer to "put" to the petitioner at any time within 90 days 50 percent of such stock at the same price, was a completed sale of all shares in 1946 or a completed sale of only those shares not subject to the "put"; and (3) whether the disposition by petitioner of 10,000 shares of Anemostat Corporation of America stock in 1947 was subject to an option to purchase substantially identical stock within 30 days and therefore a "wash sale" within the meaning of section 118 of the Internal Revenue Code of 1939, resulting in nondeductibility of loss. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioner, a corporation organized under the laws of New York State on February 2, 1920, is in the investment business. During 1946 and until February 27, 1947, it owned at least 90 percent of the outstanding capital stock of the National Insurance Company of Denver, a Colorado corporation (hereinafter referred to as National). These two corporations filed consolidated Federal income tax returns for the years 1946 and 1947 with the collector *229 of internal revenue for the third New York district. [1]
On March 14, 1946, petitioner purchased 3,427 shares of common stock of The William Schollhorn Company (sometimes hereinafter referred to as Schollhorn), paying therefor a total price of $548,540 [2] as follows: to the Estate of Walter J. Berbecker for 3,134 shares, $501,540; to Lillie Berbecker for 210 shares, $33,600; to a Mrs. Webb for 2 shares, $320; to Ethel Meyerhans for 69 shares, $5,570 in cash and 400 shares of stock in Claude Neon Lights, Inc., at an agreed price of $7 per share and 400 shares of stock of Securities Corporation General (hereinafter sometimes referred to as Securities Corporation) at an agreed price of $7 per share; and to Alfred F. Meyerhans for 12 shares, $960 *230 in cash and 75 shares of Claude Neon Lights, Inc., at an agreed price of $7 per share and 75 shares of Securities Corporation at an agreed price of $7 per share. The acquisition of the Schollhorn stock from the Estate of Walter J. Berbecker and Lillie Berbecker was conditioned upon the following: 1. that the Estate of Walter J. Berbecker would acquire from petitioner 14,286 shares of Claude Neon at an agreed price of $7 per share ($100,000) and 14,286 shares of Securities Corporation at an agreed price of $7 per share ($100,000), but that such purchase would be subject to the right of the Estate "to put" to the petitioner at any time within 90 days of completion of the sale 50 percent of each stock at the same price; and 2. that Schollhorn would acquire from petitioner shares of stock of the following companies at the prices stated: Gross
Shares
$ Value
Amounts
473
Claude Neon Lights,
Inc.
7.00
$ 3,311.00
1,875
Anemostat Corporation
of America
15.00
28,125.00
4,930
Reeves Ely Labora-
tories, Inc.
2.60
12,818.00
46,450
The Greater New York
Industries, Inc.
4.00
185,800.00
15,000
The Securities Corpo-
ration General
7.00
105,000.00
$335,054.00
*231 The above transactions were authorized by the petitioner's board of directors [3] at a special meeting held on March 14, 1946. The minutes of the meeting of the board of directors recite that the chairman stated that of the cash to be paid to stockholders of the Schollhorn Company for stock of that company, $335,000 was expected to be obtained from the sale of securities to Schollhorn; that $200,000 of the remaining amount of the purchase price was expected to be obtained from the sale by petitioner to the Berbecker Estate of the 14,286 shares of Claude Neon for $100,000 and the 14,286 shares of Securities Corporation stock for $100,000; and that the remaining $6,890 was expected to be obtained from a dividend of $12,536 declared, but unpaid, by Schollhorn on the stock to be purchased. The minutes of this meeting further indicated that at the time that the transaction was planned petitioner did not own either the Securities Corporation stock or the Claude Neon stock which was to be sold to the Estate of Walter J. Berbecker and to Alfred and Ethel Meyerhans but that arrangements were being made to obtain such stock. *232 The minutes of a special meeting of the board of directors of petitioner held on March 21, 1946, state that: The Chairman reported to the meeting the following proposed transactions between this Corporation and National Insurance Company (Denver): (1) The sale to it of 1,000 shares of The Wm. Schollhorn Co. for $250. per share, or an aggregate of $250,000. (2) The purchase from it of 50,000 shares of Securities Corporation General common stock at $5 per share, or a total of $250,000. Such minutes further stated: The Chairman pointed out that it was his understanding that National Insurance Company (Denver) intended in turn to sell such 1,000 shares of The Wm. Schollhorn Co. common stock at a like price to Louisville Fire & Marine Insurance Company and with the proceeds to exercise its option from such company for the purchase at $5 per share of 50,000 shares of Securities Corporation General stock (the said shares of Securities Corporation General stock so to be obtained by National Insurance Company (Denver) to be the shares of stock to be delivered to this Corporation in fulfillment of the program heretofore outlined by the chairman). The books of petitioner record *233 the transfer of 1,000 shares of Schollhorn stock to National on March 14, 1946, as "sold to National on March 14, 1946, as "sold to National Insurance Co. 1,000 shares @ $250 per share." The receipt of 50,000 shares of Securities Corporation from National on the same date was recorded on the books of petitioner as "50,000 shs. purchased from Nat'l Insurance Co. @ $5 per share." A June 30, 1946, entry on the books of petitioner records a gain realized on the sale of the 1,000 shares of Schollhorn in the amount of $89,935.80. After receiving the 50,000 shares of stock of Securities Corporation, the petitioner then carried out its agreement and transferred 400 shares of such stock to Ethel Meyerhans and 75 shares to Alfred Meyerhans. It also, in accordance with the agreement, transferred 15,000 shares of such stock to the Schollhorn Company and 14,286 shares to the Estate of Walter J. Berbecker. On November 1, 1946, the board of directors of the petitioner held a special meeting, the minutes of which show that it was resolved to obtain a loan of $1,000,000 and that the officers were authorized and directed to acquire, among other securities, 1,000 shares of Schollhorn stock from *234 the Louisville Fire & Marine Insurance Company (sometimes hereinafter referred to as the Louisville Company) at $250 per share, or a total of $250,000, and that the loan was to be collateralized by such Schollhorn stock and other securities. The books of the petitioner record the purchase on November 15, 1946, of 1,000 shares of Schollhorn stock from the Louisville Company at $250 per share, or a total of $250,000. The books show that a check in the amount of $473,571 was issued by the petitioner to the Louisville Company for the purchase of the Schollhorn stock and other securities. [4]
In its original income tax return for 1946, signed by Yeager as president and Henry A. McCarthy as treasurer, petitioner reported a short-term capital gain in the amount of $89,935.80 on account of *235 the sale on March 14 for $250,000 of 1,000 shares of Schollhorn stock purchased on that date at a cost of $160,064.20. An amended return was filed by petitioner for the year 1946, at a time not disclosed, in which no gain was reported on the transfer of the 1,000 shares of Schollhorn stock, with the following explanation: 1,000 shares was a part of the joint purchase of 3,427 shares of William Schollhorn Company. National Insurance Company bought 1,000 shares and Metropolitan Commercial Corporation bought 2,427 shares - then in November 1946 Metropolitan Commercial Corporation purchased the 1,000 shares which National Insurance Company had bought and sold to Louisville Fire Insurance Company from Louisville Fire Insurance Company. This transaction has no tax consequence as it was a part of a whole plan. Pursuant to its agreement with respect to the acquisition of the Schollhorn stock, the petitioner on March 14, 1946, sold to the Estate of Walter J. Berbecker 14,286 shares of Securities Corporation stock for $100,000 (about $7 per share) and 14,286 shares of Claude Neon Lights, Inc. for $100,000 (about $7 per share), subject to the right of such Estate "to put" [5] to the petitioner *236 at any time within 90 days of completion of the sale 50% of such stock at the same price. The right "to put" was subsequently extended at various times by agreement of the parties. *237 Of the 7,143 shares of each stock subject to the right to put the petitioner repurchased 1,500 shares of each on March 10, 1947, 1,500 shares of each on June 16, 1947, and 750 shares of each on September 15, 1947. On March 15, 1948, the petitioner repurchased 750 shares of Securities Corporation stock and on November 8, 1951, agreed to repurchase the remaining 2,643 shares of Securities Corporation stock subject to the put. At some time prior to June 11, 1947, the Estate sold to outside parties 1,000 shares of Claude Neon stock which had been subject to the "put" agreement, and by September 11, 1947, there remained in the hands of the Estate 2,393 shares of Claude Neon stock subject to the "put" agreement. The record does not show the disposition of this remaining 2,393 shares of Claude Neon stock. In its original income tax return for 1946 petitioner reported a short-term capital gain of $59,520 on the sale of 46,260 shares of Securities Corporation stock, which included an amount of $28,570 on account of the sale on March 14, for $100,000 of the 14,286 shares of such stock to the Estate of Walter J. Berbecker. In its amended return for the year 1946, no gain was reported on *238 the sale of the 14,286 shares of Securities Corporation stock. Therein it was stated that whereas for the purpose of the transaction in which the petitioner acquired the Schollhorn stock from the stockholders of that corporation it was agreed to value the Securities Corporation stock at $7.00 per share, the actual market value of such stock was $5.00 per share as shown by "a transaction of 10,000 shares at $5.00 per share for cash to E. M. Bratter," and that in reality the sale of Securities Corporation stock to the Estate was at a price of $5.00 per share, the difference being part of the purchase price of the Schollhorn stock. In its return for 1946 the petitioner did not segregate the sale of the 14,286 shares of Claude Neon stock sold to the Estate of Walter J. Berbecker - rather, in both the original and amended returns for that year it reported the sale of 218,922 shares of such stock, at various dates during 1946, at an aggregate loss of $30,972.27. On February 27, 1947, the petitioner purchased 10,000 shares of stock of Anemostat Corporation of America at $12 per share, or a total price of $120,000. On August 6, 1947, the petitioner disposed of these shares. Its books *239 and records show that this stock was delivered out at a price of $8.75 per share, or a total of $87,500, and that the consideration received was 10,000 shares of stock of Universal Laboratories, Inc., at a price of $5.25 per share, or a total of $52,500, plus an account receivable of $35,000. On the same date, August 6, 1947, the petitioner recorded on its books a loss on the sale of the Anemostat stock in the amount of $29,039. The records of the petitioner also contain an entry dated August 6, 1947, recording as an asset, at an amount of $50,000, an "Option dated Aug. 6 '47 for 6 months given by The Greater New York Industries, Inc. to purchase 10,000 shs. Anemostat Corporation of America shares @ $5 per sh." At the same time it also set up an amount of $50,000 as "Reserve to take up option." The petitioner's books also contain entries made at some time after September 5, 1947, but dated as of August 6, 1947, reversing the prior entries, and setting up the transaction as a transfer by it of $120,000 worth of Anemostat stock in exchange for Universal Laboratories stock of a value of $52,500 and an option, valued at $67,500, to acquire Anemostat Corporation stock. The minutes *240 of a meeting of the board of directors of the petitioner held on August 8, 1947, state that an option to purchase 10,000 shares of Anemostat Corporation for $50,000 was received from Greater New York Industries, said option to continue until February 6, 1948. An accounting firm employed by the petitioner prepared a balance sheet as of December 31, 1947, for submission to the board of directors of petitioner. As a part thereof it was noted that the petitioner had an option expiring August 6, 1948, to acquire 10,000 shares of Anemostat stock at a price of $5 per share. In its return for the year 1947 the petitioner did not claim as a deduction any loss on the disposition on August 6, 1947 of the 10,000 shares of Anemostat stock. On August 6, 1947, the petitioner entered into an option to acquire 10,000 shares of stock of Anemostat Corporation at a price of $5 per share. Opinion The first issue is whether the transfer by the petitioner to its subsidiary, National, in 1946 of 1,000 shares of Schollhorn stock constituted a taxable sale or exchange, resulting in the receipt by the petitioner of short-term capital gain. In its original income tax return for the taxable year 1946 *241 the petitioner reported a short-term capital gain in the amount of $89,935.80 on this transaction. Thereafter, at an undisclosed time the petitioner filed an amended return in which such gain was eliminated, and in its petition it alleges that the respondent's determination should be revised to eliminate any gain on this transaction. On brief the petitioner contends that the transfer of the 1,000 shares of Schollhorn stock was a part of one transaction, namely, the acquisition of 3,427 shares of Schollhorn stock from the stockholders of that company. We have described in some detail in the Findings of Fact the terms of the purchase between the petitioner and the various stockholders of Schollhorn. As part of the consideration, the petitioner was required to transfer to some of such stockholders a total of 14,761 shares of stock of Securities Corporation and to transfer to Schollhorn itself 15,000 shares of Securities Corporation stock. The petitioner did not at that time own stock of Securities Corporation. However, the subsidiary had an option to purchase 50,000 shares of Securities Corporation stock from the Louisville Company. The gist of petitioner's contention is that it received *242 the 3,427 shares of Schollhorn stock from the stockholders of that company and at the same time delivered 1,000 shares thereof to the subsidiary merely to be used as collateral to secure the acquisition of the 50,000 shares of Securities Corporation stock from the Louisville Company for a consideration of $250,000. It contends that when it in November 1946 paid the Louisville Company $250,000 this constituted payment for the Securities Corporation stock and that thereupon the Louisville Company released and retransferred the 1,000 shares of Schollhorn stock to the petitioner. It is, of course, well established that a transfer of property, absolute in form, will be treated as a mortgage thereof when it is executed as security for a loan of money; that a court may look beyond the terms of an instrument to the real transaction; and that when that is shown to be one of security, and not of sale, it will give effect to the actual contract of the parties. See Helvering v. F. & R. Lazarus & Co., 308 U.S. 352, and Peugh v. Davis, 96 U.S. 332. The governing factor in determining *243 whether a transaction amounts to a sale or a mortgage is the intention or object of the parties to the transfer, which may be gathered from the instrument and from all the attending facts and circumstances. Peugh v. Davis, supra.
The burden of proof to establish that the transaction was not a sale or exchange, as it purported to be, is upon the petitioner. The only witness who testified as to the character of this transaction was William Saxe, who was one of the directors of the petitioner at the time of the transaction and who was also the petitioner's attorney. He testified, in effect, that it is his understanding that the transfer of the Schollhorn stock to the Louisville Company through the subsidiary was to secure the payment of the purchase price of the 50,000 shares of Securities Corporation stock, which purchase price was to be paid as soon thereafter as possible. However, he testified that, while he was present at the meetings of the board of directors, he did not personally handle the transactions and had no definite memory as to what took place, but that he reconstructed *244 the transaction on the basis of a reference to the minutes of the meetings, which either he or his office prepared. He stated that the transactions were handled by the executive officers of the company, either Yeager, the president, or Yeager and McCarthy, the secretary-treasurer. The minutes of the meetings fail to disclose any reference to the transfer of the Schollhorn stock as being a mere security transfer. They show that Yeager referred to the transaction as a sale of the 1,000 shares to the subsidiary, and that Yeager stated that it was his understanding that the subsidiary intended in turn to sell the Schollhorn stock to the Louisville Company and with the proceeds exercise its option to purchase from the Louisvillecompany the Securities Corporation stock. We think that the evidence here is inadequate to show that the transfer by the petitioner of the 1,000 shares of Schollhorn stock to its subsidiary was merely a security transfer. In the first place, the petitioner on its books recorded the transfer on March 14, 1946, as a sale to its subsidiary of the stock for $250,000. The books also record a purchase by the petitioner from its subsidiary on the same date of 50,000 *245 shares of Securities Corporation stock for $250,000. Thereafter by an entry dated June 30, 1946, the petitioner recorded on its books a gain of $89,935.80 on the sale of the Schollhorn stock to its subsidiary. [6] Thereafter the original return filed by the petitioner for the taxable year 1946 reported a short-term capital gain of $89,935.80 on the sale. That return was signed by Yeager as president and McCarthy as treasurer. This is indicative that these responsible officers of the petitioner considered the transaction as a taxable sale or exchange. If the intention in transferring the stock to the subsidiary was to merely pledge such stock to the Louisville Company as security for the purchase by the petitioner or its subsidiary of the 50,000 shares of Securities Corporation stock, we cannot understand why the transaction would have been recorded on the books and reported in the return as a taxable transaction. The petitioner has offered no explanation as to why a profit would have been reported if the transaction was, indeed, a mere pledge. It may be added that the copy of the amended return for the year 1946 submitted in evidence, which bears no signatures and does not disclose *246 the filing date, contains no such explanation. There is no evidence whatever as to the relationship, if any, between the petitioner and the Louisville Company, or as to any agreement between the petitioner and the Louisville Company whereby the petitioner agreed to pay the Louisville Company $250,000 for the Securities Corporation stock, nor is there any evidence of any agreement between either the petitioner or the subsidiary and the Louisville Company providing for the retransfer of the 1,000 shares of Schollhorn stock to either the petitioner or the subsidiary. Saxe did not testify as to any details, but merely as to his conclusion of the nature of the transaction. It is true that the petitioner did acquire from the Louisville Company on November 15, 1946, which was about 8 months after the transfer of the stock by the subsidiary to the Louisville Company, 1,000 shares *247 of Schollhorn stock upon the payment of $250,000, but there is no evidence to show that this was pursuant to a pre-existing agreement or, if so, the nature of such agreement. The minutes of a meeting of the board of directors of petitioner held on November 1, 1946, show that the officers were authorized to acquire 1,000 shares of Schollhorn stock from the Louisville Company at $250 per share. The acquisition was recorded on petitioner's books as a purchase of the stock for $250,000. That this payment was what it purported to be, namely, a payment of purchase price for the Schollhorn stock, rather than a delayed payment of purchase price of the Securities Corporation stock, is, we believe, supported by the fact that insofar as the record shows the Louisville Company received no interest for the forbearance of $250,000 for 8 months. It may be added that no representative of the other parties to the transfers of the 1,000 shares of Schollhorn stock, namely, the subsidiary and the Louisville Company, was called to testify as to the intention of the parties or as to the substance of the transactions. On brief the petitioner states that at no time during the 8-month period did the Louisville *248 Company receive any dividends on the Schollhorn stock, whereas the petitioner did receive a dividend at the inception of the agreement, and states that this is indicative that the stock was not in reality owned by the Louisville Company. All that the evidence shows with respect to any dividend is that at the meeting of the directors of petitioner held on March 14, 1946, the chairman stated that a dividend had already been declared on the stock and that the petitioner expected to receive such dividend, and that the petitioner in its return for 1946 reported the receipt of dividends from Schollhorn in the amount of $12,536. There is no evidence as to the date the dividend was declared or paid, or that the Louisville Company, as a stockholder after March 14, 1946, would be entitled to any portion of the dividend. The petitioner also states on brief that the over-all plan was one to acquire control by it of the Schollhorn Company (the implication presumably being that this would tend to indicate that petitioner did not intend to dispose of the 1,000 shares of Schollhorn stock). It states that it was not until November 1946 that the over-all transaction was completed, the petitioner at *249 that time having finally acquired 3,427 shares of Schollhorn stock. It urges that we recognize this and give no effect to any of the intermediate steps or transfers. There is no specific evidence to show that the petitioner's intention was to acquire control of the Schollhorn Company, [7] but in any event we do not think this determinative. Here the petitioner apparently found it necessary to dispose of 1,000 shares of Schollhorn stock in order to obtain Securities Corporation stock to carry out its commitment to the stockholders of Schollhorn. The transaction whereby the petitioner obtained the Schollhorn stock from the stockholders and the transaction whereby it obtained the Securities Corporation stock were carried out by the petitioner with entirely different parties. We think that each of these transactions must be considered separately. *250 In view of the foregoing, we hold that the petitioner had a short-term capital gain in 1946 upon the transfer of the 1,000 shares of Schollhorn stock to its subsidiary. The amount of such gain will be computed in the recomputation under Rule 50, the parties having agreed that the basis of the 1,000 shares is to be increased by a proper portion of a finder's fee of $29,698.21 paid in connection with the petitioner's acquisition of all the Schollhorn stock. The second issue is whether, under the circumstances described in our Findings of Fact, the petitioner is taxable upon a gain of $28,570 upon the sale to the Berbecker Estate of 14,286 shares of stock of Securities Corporation. This stock had a basis $5of and was sold for $7, with a right in the purchaser to require the petitioner to repurchase half thereof at the same price within a stated period. While in its amended return and in its petition the petitioner advanced a contention apparently to the effect that the selling price of $7 was in reality a sale for $5, resulting in no gain, on brief it apparently abandons this theory, since no mention is made thereof. In any event, all the evidence we have shows that the petitioner *251 did actually receive $7 per share for the stock. On brief the petitioner contends that gain should be recognized on the sale of only half of the 14,286 shares, in view of the right of the purchaser to require the petitioner to repurchase half of the stock at the same price. Its theory is that the transaction, as to half of the stock, was either not a completed sale or that it was rescinded in the taxable year by the exercise by the purchaser of its right to require the petitioner to repurchase at the same price. We see no merit to this contention of the petitioner. There was an actual transfer of the stock by the petitioner to the Estate. The purchaser received all rights to the stock, including the right of disposition thereof, and there was no obligation to resell to the petitioner. The purchase price was received by the petitioner and became its property without restrictions upon its use. Under these circumstances the sale is not a conditional sale, and any gain derived from the transaction is income at that time. William M. Davey, 30 B.T.A. 837. There is nothing inharmonious between the conception of an absolute or completed sale and an agreement to repurchase *252 later at the option of the purchaser. Bancitaly Corporation, 34 B.T.A. 494, appeal dismissed (C.A. 9) 121 F. 2d 452. See also Frank & Seder Co., 13 B.T.A. 1, reversed on another issue, 44 F. 2d 147. The case of Ripley Realty, Inc., 23 B.T.A. 1247, affd. (C.A. 2) 61 F. 2d 1038, cited by the petitioner, does not support the petitioner's position - indeed it would seem to support the opposite conclusion in that it holds that a reconveyance by the purchaser in a year subsequent to the year of sale pursuant to the settlement of a suit alleging that the sale was made upon fraudulent misrepresentations, was a transaction separate and apart from the original sale and had no effect upon the taxpayer's tax liability for the year of the sale. We conclude that there was a completed sale in 1946 of the full 14,286 shares of Securities Corporation stock and that there is no basis for excluding the gain thereon from petitioner's taxable income for that year. On brief the petitioner makes a similar contention with respect to the sale in 1946 of 14,286 shares of Claude Neon Lights, Inc. stock, which was subject *253 to the same option of the purchaser. The respondent contends that in the petition no issue was raised with respect to the sale of the Claude Neon stock. Rule 7 of the Rules of Practice of this Court requires that the petition shall contain clear and concise assignments of each and every error which the petitioner alleges to have been committed by the respondent. We have examined the petition carefully and find that whereas the sale of the 14,286 shares of Securities Corporation stock was specifically put in issue by the assignment of error, there was no assignment of error referring to the sale of 14,286 shares of Claude Neon stock. We think that under Rule 7 of our Rules of Practice, the issue as to such stock has not been raised. Even if such issue were deemed to be raised, the answer would be the same as rached above with respect to the Securities Corporation stock. The third issue is whether the petitioner is entitled to a deduction for the year 1947 of $67,500 on account of its disposition of 10,000 shares of Anemostat Corporation of America stock. The respondent, relying upon section *254 118 of the Internal Revenue Code of 1939, [8] contends that the petitioner is not entitled to any loss deduction on the transaction because on the same date it entered into an option to repurchase 10,000 shares of the same stock. In its original return for 1947 the petitioner did not claim this loss but now contends that upon its disposition of the 10,000 shares *255 of Anemostat stock on August 6, 1947, the only consideration received was 10,000 shares of Universal Laboratories, Inc., stock of a value of $52,500, that no option was received to repurchase Anemostat stock, and that hence it had a loss of the difference between the $52,500 and the original cost of the Anemostat stock of $120,000, or $67,500. The question presented is essentially one of fact upon which the petitioner has the burden of proof. Based upon a consideration of the whole record, we think it clear, and we have found as a fact, that on August 6, 1947, the petitioner did enter into an option to purchase the same number of shares of Anemostat Corporation stock as it sold on that date. The petitioner's books and records clearly record the receipt on that date of an option to purchase 10,000 shares of Anemostat stock at a price of $5, such option to run for a period of six months. Also, the minutes of a meeting of petitioner's directors held on August 8, 1947, recite that the petitioner had received such an option from Greater New York Industries. The record contains no explanation of why the receipt of such an option would have been recited in the minutes and recorded on *256 the books if in fact there was no such option received. Furthermore, the member of an accounting firm who was personally responsible for auditing the books of the petitioner and preparing its balance sheet as of December 31, 1947 (which balance sheet showed that the petitioner held an option to purchase 10,000 shares of Anemostat stock) testified that although he himself did not see the option, he saw reference to it in the minutes of the corporation and that in the normal course of an audit of petitioner's books, his firm would have requested a copy of the option and would have read it. While, as pointed out by the petitioner, the balance sheet refers to an option expiring on August 6, 1948, whereas the petitioner's books refer to an option which would expire on February 6, 1948, we think the testimony of this witness does tend to corroborate the fact, as recited in the minutes and record books, that the petitioner did enter into an option on August 6, 1947, to purchase 10,000 shares of Anemostat stock. As stated, the petitioner has introduced no proof or suggested any reason why the minutes and the books would refer to an option, if, in fact, there was none. The only evidence which *257 petitioner introduced consisted of the testimony of William Mears, who became secretary-treasurer of petitioner at some time between March and May 1948, and was responsible for maintaining the perpetual inventory of all securities held by the petitioner, and Joseph Crosby, who was an officer of Greater New York Industries until about May 1947, when he resigned, and who later returned to that company near the end of 1948. Both witnesses stated that they had never seen such an option. However, it is to be noted that neither of the witnesses was employed by the respective corporations on August 6, 1947, and we cannot accept their testimony as establishing that the petitioner did not, on August 6, 1947, enter into an option to acquire 10,000 shares of Anemostat stock. The petitioner contends that even if it did enter into an option on August 6, 1947, to acquire 10,000 shares of Anemostat stock, nevertheless, any loss which it sustained on its sale of Anemostat stock would be deductible under the rationale of the case of Frank & Seder Co., supra, which held that a sale by the taxpayer of stock was an entirely separable transaction from the acquisition of an option to repurchase *258 the stock, and that the taxpayer was entitled to deduct the loss upon the sale. That case has no application here. The transaction there involved occurred in 1920, which was prior to the passage of the Revenue Act of 1921, which in sections 214(a)(5) and 234(a)(4) first enacted "the wash sales," provision. The petitioner also contends, in the alternative, that section 118(a) has no application to the type of loss here claimed, namely, a loss on the sale or exchange of a capital asset. It is its contention that section 118(a) specifically refers only to losses claimed under sections 23(e) and (f) of the 1939 Code, whereas, it contends its present loss is claimed under section 23(g). [9]
*259 We see no merit to this contention of the petitioner. Sections 23(e) and (f) are the provisions of the 1939 Code permitting the deduction of losses incurred by individuals and corporations, including losses upon the sale or exchange of capital assets. Section 23(g) is not the provision which grants the deduction of losses upon the sale or exchange of capital assets. Its purpose, as evidenced by its heading and text, is merely to limit the amount of the deduction in the case of losses from sales or exchanges of capital assets to the extent provided in section 117. It is our conclusion that section 118(a) precludes the deduction of any loss upon the petitioner's sale of 10,000 shares of Anemostat stock in 1946. Decision will be entered under Rule 50. Footnotes
1. The return for the calendar year 1946 included income and deductions of National Insurance for only July 1 to December 31, 1946, a separate return having been filed by that corporation for the period January 1 to June 30, 1946, with the collector's office at Denver, Colorado. The 1947 return covers the operations of the National Insurance Co. only up to February 27, 1947, the date on which petitioner sold all its stock of that company.↩
2. The stipulated total is $100 less than the sum of the stipulated amounts paid to each seller.↩
3. The board of directors consisted of William B. Yeager, who was chairman and president of the petitioner, Henry A. McCarthy, who was secretary-treasurer, Harry E. Benedict, Bernard Relin, and William Saxe. At the time of the trial, Yeager and McCarthy were deceased.↩
4. The books of petitioner also show the following subsequent transactions: A transfer of 1,000 shares of Schollhorn stock to the subsidiary as of December 31, 1946, at a value of $250 per share (the same stock as purchased from Louisville) as a contribution to capital; and a purchase by petitioner from the subsidiary on February 27, 1947, of 360 shares of Schollhorn stock at $250 per share.↩
5. The agreement with respect to the right "to put" was contained in a letter from the petitioner to the Estate which provided as follows: As an inducement to you to purchase from this corporation the following securities for the consideration set forth: 14,286 shares of Claude Neon Lights,
Inc.
$100,000
14,286 shares of Securities Corpora-
tion General
$100,000
we agree that you shall have the right to put to us on three days notice 7,143 shares of stock (one half of the amount above set forth) of Claude Neon Lights, Inc. and 7,143 shares of stock (one-half of the amount above set forth) of Securities Corporation General at $7.00 a share for the Securities Corporation General and $7.00 a share for the Claude Neon Lights, Inc. and we agree to pay for such stock at the above prices on delivery. This put shall be effective for a period beginning thirty days from date and ending ninety days from date and shall be exercisable by you in whole or in part at one time or from time to time.↩
6. In this connection it should be pointed out that although the petitioner and the subsidiary filed a consolidated income tax return for the calendar year 1946, they were not consolidated for the period preceding July 1, 1946, and hence the transaction in question did not occur during the consolidated period.↩
7. On brief the petitioner states that Saxe testified that the plan was one to "retain" 80% control of the Scholihorn Company. In this the petitioner is evidently mistaken since we find no such testimony. The petitioner's return for the year 1946 shows that at December 31, 1946, it owned 57.0656% of the outstanding Schollhorn stock. At the meeting of March 21, 1946, the chairman stated that if half of the 3,427 shares of Schollhorn stock were sold the petitioner would still retain approximately 51% of all Schollhorn stock. The balance sheet of the petitioner as of December 31, 1947, showed the petitioner owning 2,787 shares of Schollhorn stock, stated to be 69.21% of outstanding Schollhorn stock.↩
8. SEC. 118. LOSS FROM WASH SALES OF STOCK OR SECURITIES. (a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired * * * or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 23(e)(2); nor shall such deduction be allowed under section 23(f)↩ unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business.
9. Section 23 of the Internal Revenue Code of 1939 provides in part as follows: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or * * *
(f) Losses by Corporations. - In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise. (g) Capital Losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117↩.