**MAJOR REALTY CORPORATION AND SUBSIDIARIES, Petitioner-Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 83–3546.

United States Court of Appeals, Eleventh Circuit.

Jan. 8, 1985.

Bradley J. Davis, Orlando, Fla., for petitioner-appellant.

Joel Gerber, Chief Counsel, I.R.S., Michael L. Paup, Chief, Glenn L. Archer, Jr., Asst. Atty. Gen., Kenneth L. Greene, Richard Farber, U.S. Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before FAY and VANCE, Circuit Judges, and MacMAHON *, District Judge.

* Honorable Lloyd F. MacMahon, U.S. District Judge for the Southern District of New York, sitting by designation.

MacMAHON, District Judge:

Major Realty Corporation and its subsidiaries ("Major") appeal from a judgment of the United States Tax Court, Leo H. Irwin, Judge, entered on February 24, 1983, determining a deficiency of $1,198,970 on Major's reported income tax for fiscal year ended May 31, 1972. Affirmed in part and reversed in part.

## FACTS

Major was incorporated in 1959 for the purpose of acquiring, developing, holding, and selling real estate. In 1967, anticipating the impact of Disney World, it devised a master plan for the development of a 2,500–acre tract which it owned near Orlando, Florida, known as Major Center. The plan called for Major to retain the property for development, lease the property, or, if sales were necessary, to become a joint venturer in the development of property sold.

As its initial step, on March 31, 1968, Major agreed to sell 175 acres located within Major Center, for $20,000 per acre, to Edward J. DeBartolo Corporation ("DeBartolo"), a developer of shopping malls. The contract required DeBartolo to deposit $25,000 as earnest money, close the sale by May 31, 1968, and start construction or secure commercial leases by June 1, 1969. In the event of default, Major could rescind the contract, have the property reconveyed, and have all monies refunded and all notes and mortgages cancelled. DeBartolo assigned its rights under the contract to Florida Mall Corporation ("Florida Mall"), its wholly-owned subsidiary, on April 16, 1968.

On May 22, 1968, Major executed and delivered a warranty deed describing the 175 acres conveyed to Florida Mall. The deed was recorded in the public records of Orange County, Florida. The next day, May 23, 1968, the parties executed a supplemental agreement ("Supplement") granting Florida Mall a right for six months to exchange the 175 acres conveyed for any other 175 acres located within Major Center if dissatisfied with the tract described in the deed. Subsequently, on December 13, 1968, Florida Mall decided to keep the original 175 acres, and a formal agreement finalizing the transfer of the original deed was recorded on March 25, 1969. Florida Mall, however, failed to start construction or to secure a lease from a major retailer, and on January 19, 1970 Major exercised its right to rescind. The 175-acre plot was reconveyed to Major, and Major recorded the reacquisition price as its cost basis.

Due to its financial condition, Major was unable to hold and develop Major Center and, therefore, made a limited partnership agreement with Gulf Oil Real Estate Development Company under which the entire Major Center property, including the reacquired 175 acres, would be acquired by the newly-formed partnership (Major Center Limited). The partnership agreement and a deed transferring all the Major Center property were executed on April 24, 1972.

## TAX PROCEEDINGS BELOW

In its income tax return for fiscal year 1972, Major reported a gain on the sale of Major Center and based its gain on the reacquisition price of the included 175 acres rather than on its original cost. The Commissioner of Internal Revenue determined that the 1968 sale to Florida Mall was not a sale but an executory contract or an option, that the tax basis of the 175 acres was the original cost not the reacquisition price, and, consequently, that the gain on the sale of Major Center was understated. He further determined that the profit on the sale should have been reported as ordinary income because Major Center was held primarily for sale in the ordinary course of business.

Major appealed to the Tax Court which rejected the Commissioner's contention that the Florida Mall deed was in substance an executory contract or an option. The court concluded that the transaction constituted a sale, but that the parties never "intended" to close the sale by the transfer of the May 22, 1968 deed because the deed, when read with the Supplement, established an "unwillingness" on the part of Florida Mall to commit to an exact 175-acre location, and the only reasons for the trans-

fer were (1) Major's tax benefits in exhausting expiring net operating loss carryovers, and (2) Major's ability to issue additional notes pursuant to a Note Purchase Agreement. The court, therefore, held that the sale was not complete for income tax purposes until fiscal year ended May 31, 1969, when the parties entered into an agreement finalizing the transfer of the acreage described in the original deed. The court further held that Major Center was not held for investment but for sale in the ordinary course of business, and that the gain on the sale was therefore taxable as ordinary income.

## FLORIDA MALL SALE

On appeal, Major contends that the Tax Court erred in holding that the Florida Mall transaction was not a completed sale until fiscal year 1969, arguing, in essence, that the sale was complete on the delivery of the deed in May 1968 because title and the benefits and burdens of ownership were thereby transferred from Major to Florida Mall. The Commissioner contends that Florida Mall merely acquired bare legal title at the May 22, 1968 closing, and, consequently, the benefits and burdens of ownership did not pass to Florida Mall until the precise land sold was identified and the formal agreement finalizing the transfer was recorded on March 25, 1969.

 The question as to when a sale is complete for purposes of federal income tax is essentially one of fact to be resolved by a practical consideration of all surrounding facts and circumstances. *Clodfelter v. Commissioner*, 426 F.2d 1391 (9th Cir. 1970). The courts, however, have consist-

ently held that the transfer of ownership is completed upon the passage of title or passage of the benefits and burdens of ownership, whichever occurs first. *Dettmers v. Commissioner*, 430 F.2d 1019 (6th Cir. 1970). The time of passage of title and the legal rights thereby created are determined by state law. *Fletcher v. United States*, 436 F.2d 413 (7th Cir.1971).[1] Title to real property under Florida law is transferred upon delivery by the grantor of a valid deed to the grantee. *Headley v. Pelham*, 366 So.2d 60 (Fla.Dist.Ct.App.1978). The clearest manner of delivery is by manual transfer of a prepared deed with accompanying words or circumstances showing appropriate intent, the very method used to deliver the May 22, 1968 warranty deed in the instant case. *Fred T. Ley & Co. v. Wheat*, 64 F.2d 257 (5th Cir.1933).

Title here, therefore, was transferred to Florida Mall upon delivery of the deed at the May 22, 1968 closing. The question for us is thus reduced to whether the Supplement's granting of a right to exchange the property drained Florida Mall's title of the usual benefits and burdens of ownership. We hold that it did not.

 The deed and the Supplement were executed as part of the same transaction. They must therefore be construed together. *Howell v. Fiore*, 210 So.2d 253 (Fla. Dist.Ct.App.1968).

 There can, however, be no question that Florida Mall became unconditionally obligated to pay the full purchase price upon the conveyance of the deed at the May 22, 1968 closing.[2] The right to exchange the property did not relieve that

---

**1.** Whether the transaction here is a completed sale for tax purposes must be measured by a federal standard rather than on the characterization of the contract under state law. *Cf. Lyeth v. Hoey*, 305 U.S. 188, 194, 59 S.Ct. 155, 158, 83 L.Ed. 119 (1938). Nonetheless, the legal rights created (as opposed to how those legal rights are to be interpreted) and the disposition of the property which was made under the contract and deed must be determined under state law. *Fletcher v. United States*, 436 F.2d 413 (7th Cir.1971); *Commissioner v. Stuart*, 300 F.2d 872 (3d Cir.1962).

**2.** Florida Mall's obligation to pay the purchase price was subject only to its failure to perform

the conditions subsequent, pursuant to paragraph 3B of the March 31, 1968 contract. The Tax Court properly found that paragraph 3B created an enforceable condition subsequent under Florida law. *See Peterson v. Peterson*, 431 So.2d 672 (Fla.Dist.Ct.App.1983). Conditions subsequent do not effect a delay in the time of closing since they are by their nature subsequent to the completion of the sale. *Consolidated Gas & Equipment Co. v. Commissioner*, 35 T.C. 675 (1961). Furthermore, the option to rescind the contract was exercisable only by Major.

obligation. The Supreme Court has used this date of unconditional liability as a benchmark for determining when a transaction is closed for tax purposes. *Lucas v. North Texas Lumber Co.*, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668 (1929). *See also Commissioner v. North Jersey Title Ins. Co.*, 79 F.2d 492 (3d Cir.1935). Furthermore, financing arrangements were negotiated at arm's length. As purchaser, Major paid the property taxes for the years 1968, 1969 and 1970, acquired title insurance, and engaged in the continuous activity of preparing the site for construction. These all had economic substance.

In view of these economic realities, the Tax Court's questionable finding that the parties did not "intend" to close is "immaterial to the characterization of the transaction for tax purposes." *Frank Lyon Co. v. United States*, 536 F.2d 746, 751 (8th Cir. 1976), *rev'd on other grounds*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978).[3]

Finally, the right of exchange is not inconsistent with an intent to close a sale. It is analogous to an agreement requiring a seller to repurchase property, at purchaser's request,[4] which does not prevent the closing of a transaction for tax purposes. *See, e.g., Metropolitan Commercial Corp. v. Commissioner*, 22 T.C.M. (CCH) 533 (1963). Actually, the right of exchange in the instant case is more compelling evidence of a valid transfer than a right of repurchase because the purchaser here con-

tinues to bear the risk of depreciation in neighboring property values and to be obligated for the full purchase price.

We conclude that the deed, even coupled with the right to exchange, was sufficient to transfer title and the benefits and burdens of ownership to Florida Mall. *See Wiggins v. Commissioner of Internal Revenue*, 72 T.C. 701 (1979) (sale was complete even though purchasers retained the option to exchange lots described in the contract to the deed). We, therefore, reverse the Tax Court's finding and hold that the sale was complete at the May 22, 1968 closing and that, in accordance with the parties' stipulation,[5] the correct amount of the deficiency is $437,272.

## SALE OF MAJOR CENTER

In April 1972, Major sold its entire interest in the Major Center property. Major argues that the Tax Court erred in denying it capital gain treatment from the bulk sale of Major Center because its primary purpose of retaining the property was as an investment. The Commissioner, however, argues that the court was correct in determining that the sale occurred in the ordinary course of Major's business and thus was properly taxed as income.

■■■■■ The question for us is whether the property was held "primarily for sale to customers in the ordinary course of taxpayer's trade or business," within the meaning of Section 1221(1)[6] or Section 1231(b)(1),[7]

---

**3.** Moreover, the Tax Court improperly held that the March 25, 1969 agreement was demonstrable of an intent to "complete" the transaction, as the Commissioner contends. As the Commissioner correctly pointed out, Florida Mall's right of exchange was limited to a six-month period following execution of the Supplement. By the very terms of that agreement, Florida Mall's right of exchange terminated on November 23, 1968. Therefore, the March 25, 1969 agreement could only have served the purpose expressed therein, *i.e.*, to provide a metes and bounds description which was previously unavailable. The recording of the March 25, 1969 agreement simply did not have any other legal effect.

**4.** For example, under Florida law, Florida Mall would have to execute a deed conveying the property to Major, the consideration for the conveyance being the property desired by Florida Mall, hence a repurchase of the property. Fla.Stat. § 689.01 (1981).

**5.** The parties stipulated that if the court held that the sale to Florida Mall was completed in

Major's fiscal year ended May 31, 1968, then the correct amount of the deficiency is $437,272.

**6.** All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. Section 1221(1) provides:

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business...."

**7.** Section 1231(b)(1) provides:

"(b) Definition of property used in the trade or business.—For purposes of this section—

(1) General rule.—The term 'property used in the trade or business' means property used in the trade or business, of a character which

with the result that gain upon its sale is to be treated as ordinary income rather than capital gain. "Primarily," for these purposes, means "of first importance" or "principally." *Malat v. Riddell*, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). The question is purely factual, to be determined on a case-by-case approach. The courts have given consideration to several factors to aid in deciding this question:

"(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales."

*United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir.1969). *See Biedenharn Realty Co. v. United States*, 526 F.2d 409 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

 The most important factor is the frequency and substantiality of the taxpayer's sales. This factor is highly probative in the real estate context because the presence of frequent sales ordinarily belies the contention that the property is being held "for investment" rather than "for sale." *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980). Although this factor is not dispositive of the tax question, ordinary income tax rates usually apply when dispositions of subdivided property over a period of

time are continuous and substantial rather than isolated and few. *Houston Endowment, Inc. v. United States*, 606 F.2d 77, 81 (5th Cir.1979).

 Major was incorporated for the stated purpose of acquiring, developing, holding, and selling real estate. Major's primary source of income, from its inception until the sale of Major Center, was from the sale of its land. Prior to its 1968 fiscal year, all of Major's land was classified as property "held for sale." In 1968, it divided its land into two categories, "held for sale" and "held for development." The only property placed in the latter category was Major Center. Major argues that from that point on Major Center was not held for sale in the ordinary course of its business. It contends that the sales made from Major Center were to enable it to develop the remainder of the property for its own use.

The frequent and continuous sales which taxpayer engaged in and the substantial improvements made to the property belie Major's argument. Despite Major Center's categorization, all of Major's sales during its 1971 and 1972 fiscal years were parcels from Major Center. Thus, prior to the sale of Major Center to the limited partnership, Major had sold approximately 16% of the total value of the property (not including the 175 acres sold to DeBartolo). The Tax Court correctly found that this was not an insignificant amount.

Although we place greatest emphasis on the frequency and substantiality of sales over an extended time period, our decision is aided by the presence of Major's improvements and other development activities aimed at increasing sales of Major Center. *Biedenharn Realty Co. v. United States, supra*, 526 F.2d at 417. Major

is subject to the allowance for depreciation provided in section 167, held for more than 1 year, and real property used in the trade or business, held for more than 1 year, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business,

(C) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by a taxpayer described in paragraph (3) of section 1221, or

(D) a publication of the United States Government (including the Congressional Record) which is received from the United States Government, or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by a taxpayer described in paragraph (5) of section 1221."

spent over $1,500,000 in development costs for platting subdivisions covering 415 acres and for other improvements, including streets, utilities, and drainage structures. These substantial improvements further support the conclusion that Major sold Major Center in the ordinary course of business. *See Houston Endowment, Inc. v. United States, supra,* 606 F.2d at 82.

Ideally, Major desired to develop the property itself or to become a joint venturer in the development of any property it sold. Nonetheless, where it would be more beneficial to sell, rather than to develop the property, Major was not hesitant to do so. It always maintained that it was in the business of buying and selling real estate. In fact, the 2,500–acre tract, given Major's resources, was much too large for Major to develop itself; therefore, it would have had to sell some of the land in order to continue developing other sections of the property. Even if Major's original intent were to maintain the property for investment, the facts indicate that there was a thoroughgoing change of purpose from investment to sales which precludes this court from allowing capital gain treatment. *See Biedenharn Realty Co. v. United States, supra,* 526 F.2d at 423.

Major's final argument is that the Major Center sale was not "ordinary" in the course of its business. Its sole contention is that the sale of a large tract of land in one transaction cannot be ordinary. As has been demonstrated, the sale of real estate by Major was the usual business practice and was certainly not a departure from normal events. *See, e.g., United States v. Winthrop, supra,* 417 F.2d at 912. Major was not liquidating its business; it used the funds from the sale to the limited partnership to invest further in property and development.

Our consideration of the relevant factors thus leads us to conclude that the Tax Court did not err in holding that the sale of Major Center was a sale in the ordinary course of Major's business and that the profit realized was properly taxed as ordinary income.

The judgment of the Tax Court is AFFIRMED in part and REVERSED in part.