KENNETH R. DUNWOODY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dunwoody
Docket No. 20229-90
United States Tax Court
T.C. Memo 1992-721; 1992 Tax Ct. Memo LEXIS 765; 64 T.C.M. (CCH) 1556; December 21, 1992, Filed Decision will be entered under Rule 155. For Petitioner: Joe K. Gordon. For Respondent: Shelley D. Turner and William Mark Scott. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in and additions to the Federal income taxes of Kenneth R. and Christy M. Dunwoody: [1]
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1986
$ 87,699
$ 4,385
50% of interest
$ 21,925
1987
8,759
438
due on the
2,190
deficiency
*766 Petitioner made some concessions. [2] The issues remaining for decision are: (1) Whether petitioner held certain parcels of land for sale to customers in the ordinary course of his trade or business within the meaning of section 1221(1); (2) whether petitioner's cutting horse activities were engaged in for profit within the meaning of section 183; (3) whether expenses incurred by Ross-McClain, Inc., petitioner's wholly owned corporation, constituted constructive dividends to him; (4) whether petitioner is liable for the additions to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a)(1)(A) and (B) for 1986 and 1987; and (5) whether petitioner is liable for the addition to tax for substantial understatement of tax pursuant to section 6661 for 1986 and 1987. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *767 of facts and the attached exhibits are incorporated herein by this reference. Background
Petitioner Kenneth R. Dunwoody resided in Arlington, Texas, at the time he filed his petition. He and his former wife, Christy M. Dunwoody, timely filed joint Federal income tax returns for 1986 and 1987. Petitioner was a calendar year, cash basis taxpayer for the years in issue. He employed Robert Ray Brackeen, a certified public accountant, to prepare his personal Federal income tax returns. Mr. Brackeen also prepared the corporate tax returns of Ross-McClain, Inc. (Ross-McClain), petitioner's wholly owned corporation. On November 7, 1989, petitioner filed a voluntary petition for bankruptcy under chapter 7 of the Bankruptcy Code (11 U.S.C.) with the United States Bankruptcy Court, Fort Worth, Texas, Division. On March 15, 1990, he received a discharge in bankruptcy. I. The Real Estate Activities of Petitioner and Ross-McClain
Petitioner began working in the homebuilding industry in the early 1970s. During the years in issue, he was the 100-percent shareholder of Ross-McClain, a corporation that was organized in approximately 1979. Ross-McClain was involved in buying *768 and developing real property for residential use purposes, such as home construction. Ross-McClain based its taxable year on a fiscal year beginning April 1 and ending March 31, and utilized the accrual method of accounting. Ross-McClain's records with respect to its home construction business were maintained in a businesslike manner. Ross-McClain usually purchased land, developed lots on that land, and either built houses or sold the lots to other builders. In several instances, petitioner purchased land in his individual capacity and later sold that land for development to Ross-McClain or to third parties. Ross-McClain built over 580 custom homes during its existence. Due to a decline in its real estate business, on January 27, 1989, Ross-McClain filed a voluntary petition for bankruptcy under chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court, Fort Worth, Texas, Division (case no. 489-40302). This petition was dismissed on June 20, 1989. On March 9, 1989, Ross-McClain filed another voluntary petition for bankruptcy under chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court in Fort Worth (case no. 489-40883). The case was closed *769 in 1989 and subsequently reopened on December 28, 1989. Case no. 489-40883 was still pending in the Bankruptcy Court when the instant case was tried. a. Wyndham Place Estates Phase I
On May 9, 1985, petitioner purchased three plots of land in Tarrant County, Texas, totaling 23.702 acres. These plots comprised what was commonly referred to as "Wyndham Place Estates Phase I" (Wyndham I). At the time petitioner acquired Wyndham I, the property was not zoned for development. However, on the day he purchased the property, petitioner filed a preliminary plat on Wyndham I with the City of Arlington Planning and Zoning Committee. The preliminary plat specified plans to divide the acreage into 73 lots. On May 16, 1985, petitioner filed a restrictive covenant on 14.242 acres of Wyndham I. The covenant restricted the lots' development to one single-family dwelling per lot. The document imposing this restriction erroneously stated that the subject property was owned by Ross-McClain instead of petitioner. The document was executed by petitioner on May 9, 1985, as president of Ross-McClain. In the process of platting Wyndham I, the Development Review Committee of the City of Arlington, *770 Texas, added a stipulation to petitioner's preliminary plat proposal. Petitioner appealed the stipulation to the Arlington City Council, and ultimately submitted a final plat for Wyndham I on August 15, 1985. The final plat for Wyndham I listed petitioner as owner and developer of the property. b. Wyndham Place Estates Phase II
On July 15, 1985, petitioner acquired 15.1845 acres of land in Tarrant County, Texas, pursuant to a like-kind exchange. This land comprised what was commonly referred to as "Wyndham Place Estates Phase II" (Wyndham II). Wyndham II was contiguous with Wyndham I. At the time petitioner acquired Wyndham II, it was not zoned for development. On July 15, 1985, petitioner executed a deed of trust on Wyndham II. On July 25, 1985, petitioner filed a preliminary plat with the City of Arlington, proposing to subdivide Wyndham II into 52 lots. He submitted a final plat for Wyndham II on September 26, 1985. The final plat for Wyndham II listed petitioner as the owner and developer of the property. While petitioner was involved with Wyndham I and II, Ross-McClain was developing and building another subdivision in Arlington, called Parker Oaks. Petitioner *771 had individually purchased the land that comprised Parker Oaks. c. Sale of Wyndham I and II
The real estate market in the area surrounding Wyndham I and II was declining in the late 1980s. Nevertheless, on April 16, 1986, petitioner sold all of his interests in Wyndham I and II to Powers Construction Co., Inc. (Powers Construction), a real estate developer, for $ 1,626,380. On his 1986 joint Federal income tax return, petitioner reported a total basis of $ 1,430,341 in Wyndham I and II, and a total realized gain of $ 196,039 on the sale of the properties. He reported this gain as capital gain. At the time the properties were sold, no physical development had been done to the land. After petitioner transferred Wyndham I and II to Powers Construction, Ross- McClain purchased lots from Powers Construction and constructed houses on the lots in these developments. II. Petitioner's Cutting Horse Activities
Petitioner grew up on a farm in a rural community. He participated in rodeo in high school. He continued riding horses and was an avid rider during the years in issue. In the early 1980s, petitioner became interested in cutting horse [3] activities, and his corporation, *772 Ross-McClain, began purchasing horses. Petitioner read magazines and journals, and attended horse shows to educate himself in this area. He also discussed the ramifications of entering the business with his accountant, particularly future tax benefits. Petitioner did not, however, conduct an extensive study of the cutting horse business prior to entering into these activities, and he did not establish a regular training program conducted by qualified trainers. Neither did he develop a profit plan. Petitioner began purchasing horses of his own in 1982. He raised, competed, and sold his cutting horses. In addition, he trained and competed horses owned by Ross-McClain. He worked with the horses on a part-time basis. He kept and trained his horses on land that he owned located across the creek from his home and barn. Petitioner acquired horses on the following dates and in the following manner: (1) On March 5, *773 1982, petitioner acquired a brood mare named Mae Glo. This acquisition was made in conjunction with Ross-McClain. Petitioner bred Mae Glo and subsequently sold her. (2) On January 10, 1984, petitioner acquired a trained mare named Doc's Red Rattler, a competition cutting mare that petitioner did not breed. In early 1985, petitioner sold Doc's Red Rattler for approximately the same amount that he had paid for her. (3) On June 1, 1984, petitioner acquired a stallion named Doc A Dolly. He used Doc A Dolly as a competitive cutting horse. He attempted to use Doc A Dolly for stud services but was unsuccessful, and Doc A Dolly was gelded. The horse eventually died of an intestinal disease. (4) On December 8, 1984, petitioner purchased a mare named Nancy Bee Quixote. He rode Nancy Bee Quixote in competition. Between June 9, 1986, and September 10, 1986, Nancy Bee Quixote won $ 5,237 in prize money. Nancy Bee Quixote was sold pursuant to petitioner's bankruptcy proceedings. (5) On September 1, 1986, petitioner acquired a mare, The Sister Peppy, from Ross-McClain. The horse was born on petitioner's ranch. Although petitioner rode The Sister Peppy, she was not a good cutting horse *774 and he later sold her. (6) On June 6, 1985, petitioner acquired King Quixote, a stallion, from Ross-McClain. It is unclear whether he paid Ross-McClain for this horse. Ross-McClain originally purchased King Quixote for $ 60,000 on March 1, 1985. Petitioner advertised King Quixote for stud service, and relied on this horse for his breeding operations. However, the horse was uninsured because of a cracked hoof, and later died of unknown causes. Petitioner did not have an autopsy performed on King Quixote. Petitioner produced copies of two advertisements that he placed involving his horses. He has not established that he placed either of these advertisements more than once. Petitioner instituted no consistent and concentrated program of advertising for his cutting horse activities. In 1988, due to the decline of his real estate business, petitioner was unable to continue financing his cutting horse activities. As a result, he discontinued these activities. Petitioner never showed a profit in any year from his cutting horse operations. Petitioner's financial recordkeeping practices with respect to his cutting horse activities were limited to retaining his checks and invoices *775 until the end of the year, and sending these items to his accountant for preparation of his joint Federal income tax returns. Petitioner's accountant did not prepare monthly or quarterly financial statements with respect to the cutting horse activities. In sum, petitioner did not maintain books and records of his cutting horse activities in a businesslike manner. With respect to the reporting requirements of the governing association, the American Quarter Horse Association (AQHA), petitioner relied on individuals employed in Ross-McClain's business office to prepare the necessary reports. Although the rules of the AQHA require a seller of a horse to submit transfer papers, petitioner relied on the buyers of his horses to submit such papers. His failure to follow the rules of the AQHA resulted in his suspension from that organization. On Schedules F (Farm Income and Expenses) attached to his joint 1986 and 1987 Federal income tax returns, petitioner listed net Schedule F losses of $ 41,993 and $ 36,064 for 1986 and 1987, respectively. In the notice of deficiency, respondent determined that petitioner's cutting horse activities were "not engaged in for profit." Consequently, *776 respondent disallowed petitioner's cutting horse deductions reported on his 1986 and 1987 joint income tax returns to the extent these deductions exceeded petitioner's gross income from these activities. III. Ross-McClain's Cutting Horse Activities
Ross-McClain became involved in cutting horse activities in approximately 1980. There was no clear distinction between petitioner's cutting horse activities and those of Ross-McClain. For example, petitioner rode both his individually owned horses and those of the corporation. In addition, the property owned by Ross-McClain where it conducted its cutting horse activities was contiguous with petitioner's property where he conducted his cutting horse activities. Petitioner allowed his horses to roam onto the Ross-McClain property. As stated above, Ross-McClain purchased King Quixote for $ 60,000 on March 1, 1985, and transferred him to petitioner on June 6, 1985. Also, on September 1, 1986, Ross-McClain transferred The Sister Peppy to petitioner. The record is unclear whether petitioner made any payments to Ross-McClain with respect to these transfers. Ross-McClain never showed a profit from its cutting horse activities. *777 During the years in issue, both petitioner and Ross-McClain paid expenses relating to the cutting horse activities. Ross-McClain paid a portion of petitioner's personal expenses for his cutting horse activities. In the notice of deficiency, respondent characterized cutting horse expenditures made by Ross-McClain as constructive dividends to petitioner for 1986 and 1987. Ross-McClain's records with respect to its cutting horse activities were not maintained in a businesslike manner. Little effort was made to segregate the expenses of the corporation from those of petitioner. There is no evidence in the record to indicate that petitioner repaid Ross-McClain for the cutting horse and breeding expenses that it bore on his behalf. Some of the expenses deducted by Ross-McClain on its returns related to horses owned by petitioner. Respondent performed a reconciliation of Ross-McClain's fiscal years to determine the amount of petitioner's constructive dividends from Ross-McClain for the years in issue. Respondent determined that petitioner received constructive dividends of $ 36,024 and $ 42,097 for 1986 and 1987, respectively. Ross-McClain had sufficient earnings and profits to *778 support these constructive dividends determined by respondent. OPINION Issue 1. Whether Wyndham I and II Were Capital Assets
The first issue for decision is whether petitioner held Wyndham I and II as capital assets. Petitioner argues that he correctly treated these properties as capital assets on his 1986 Federal income tax return. Respondent contends to the contrary. Section 1221(1) provides that property held by a taxpayer primarily for sale to customers in the ordinary course of a taxpayer's trade or business is not a capital asset. The function of section 1221(1) is "to differentiate between the 'profits and losses arising from the everyday operation of a business' * * * and 'the realization of appreciation in value accrued over a substantial period of time'". Malat v. Riddell, 383 U.S. 569, 572 (1966). "Primarily" means "principally" or "of first importance." Id. Petitioner bears the burden of proving that Wyndham I and II were capital assets. See Rule 142(a); Cottle v. Commissioner, 89 T.C. 467, 485 (1987). The United States Court of Appeals for the Fifth Circuit has stated that section 1221(1) *779 gives rise to three principal questions: (1) Was the taxpayer engaged in a trade or business, and if so, what business? (2) Was the taxpayer holding the property primarily for sale in that business? (3) Were the sales contemplated by the taxpayer "ordinary" in the course of that business? Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980). The first question is whether petitioner was engaged in the real estate business. "The question is whether the taxpayer has engaged in a sufficient quantum of focused activity to be considered to be engaged in a trade or business." Id. at 181. To be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Paoli v. Commissioner, T.C. Memo. 1991-351. However, in S & H, Inc. v. Commissioner, 78 T.C. 234, 244 (1982), *780 we stated that there is no -- "one-bite" rule, such that a taxpayer who engaged only in one venture or one sale cannot under any circumstances be held to be in a trade or business as to that venture or sale. * * * [Fn. ref. omitted.]
Petitioner began working in the homebuilding industry in the early 1970s. This activity did not solely consist of acting on behalf of Ross-McClain. Petitioner testified that in several instances he also purchased undeveloped property in his individual capacity which he later sold for development to Ross-McClain or third parties. Parker Oaks was one such property. Wyndham I and II were others. In the cases of Wyndham I and II, [4] petitioner certainly engaged in a "sufficient quantum of focused activity", with a sufficient number and regularity of sales, to be considered in the real estate business. We note that in Reese v. Commissioner, 615 F.2d 226, 230-231 (5th Cir. 1980), affg. T.C. Memo. 1976-275, the court stated that a single venture ordinarily is not a trade or business in the absence of an expectation of a taxpayer's continuing in the same field of endeavor. Here, it is *781 clear that petitioner engaged in multiple real estate ventures. Petitioner acquired Wyndham I and II in just over 2 months for a total purchase price of $ 1,430,341. With respect to the land comprising Wyndham I, he was able to close three separate transactions (three tracts of land) in one day. Petitioner filed plats with the City of Arlington Planning and Zoning Committee to subdivide the land comprising Wyndham I and II, and appealed a stipulation proposed by the Arlington Development Review Committee. The final plats for Wyndham I and II listed petitioner as the owner and developer of the properties. His efforts in obtaining subdivision approval illustrate that he was not a passive investor. *782 He also filed a restrictive covenant regarding Wyndham I, restricting the lots' development to one single-family dwelling per lot. (The document imposing this restriction erroneously stated that the subject property was owned by Ross-McClain.) These activities were conducted in a businesslike manner. Accordingly, based on the record before us, we hold that petitioner was in the real estate business and that he held Wyndham I and II as part of that business. Thus, we must decide whether petitioner's primary purpose was to hold the properties for sale to customers in the ordinary course of his trade or business or whether his primary purpose was to hold the properties for some other business reason. Whether property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business is a question of fact. Guardian Industries Corp. v. Commissioner, 97 T.C. 308, 315-316 (1991); Cottle v. Commissioner, supra at 486; S & H, Inc. v. Commissioner, supra at 242. Several factors are considered in deciding this issue, but no one factor is controlling. Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976). *783 It is generally the taxpayer's purpose in holding the property at the time of sale that must be determined, although we may consider events occurring prior to such time in order to identify such purpose. Guardian Industries Corp. v. Commissioner, supra at 316; Cottle v. Commissioner, supra at 487. The following factors are considered in determining whether a particular property is held for sale to customers in the ordinary course of a taxpayer's trade or business: (1) The nature and purpose of the acquisition and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of the supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. See Byram v. United States, 705 F.2d 1418, 1424 (5th Cir. 1983); *784 United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); Guardian Industries Corp. v. Commissioner, supra at 316-317; Cottle v. Commissioner, supra at 487-488. We note that these factors have no independent significance but merely aid the finder of fact in determining, on the basis of the entire record, the taxpayer's purpose in holding the property. See Byram v. United States, supra at 1424. Petitioner argues that he intended to and indeed held Wyndham I and II for investment purposes. Respondent, on the other hand, contends that petitioner intended to prepare the land for development, and then sell it to his corporation or third parties. We agree with respondent and hold that petitioner held Wyndham I and II for sale to customers in the ordinary course of his real estate business. As a result, the proceeds from the sale of the properties must be characterized as ordinary income. Our conclusion is supported by the considerations discussed below. At issue in a dealer-versus-investor case is a taxpayer's motivation in holding a particular *785 piece of property. See, e.g., Jersey Land & Development Corp. v. United States, 539 F.2d 311 (3d Cir. 1976). Petitioner testified that he intended to develop both Wyndham I and II. In fact, immediately following his purchase of the properties, he began the process of obtaining the necessary approvals for the zoning and subdividing of the properties. As part of the platting process, petitioner appealed a stipulation to the City Council. It is evident that he spent a substantial amount of time developing his properties. Petitioner held the properties for under 1 year. This relatively short period of time also supports our conclusion that petitioner held the property for sale to customers in the ordinary course of his trade or business. See, e.g., Nash v. Commissioner, 60 T.C. 503 (1973). During the time he owned the properties, he held himself out as owner and developer of the properties. Further, the sale of Wyndham I and II was "ordinary" in the course of petitioner's business. We note that a sale of a large tract in a single transaction does not necessarily mean that the property was not held for sale in the *786 ordinary course of a taxpayer's trade or business. See Major Realty Corp. v. Commissioner, 749 F.2d 1483, 1489 (11th Cir. 1985), affg. in part and revg. on another issue T.C. Memo. 1981-361; Williams v. United States, 329 F.2d 430 (5th Cir. 1964); Lawrie v. Commissioner, 36 T.C. 1117, 1121 (1961). Petitioner had a history of purchasing raw land which he later sold for development, such as Parker Oaks. The transactions involved here were not "an isolated holding dissimilar from any other transaction and unrelated to the history of petitioners' activities." Goodman v. Commissioner, 40 B.T.A. 22, 24 (1939). In sum, based on the entire record before us, as well as petitioner's failure to meet his burden of proof, we hold that petitioner held Wyndham I and II primarily for sale to customers in his real estate trade or business within the meaning of section 1221. We therefore sustain respondent's determination on this issue. Issue 2. Whether Petitioner Engaged in Cutting Horse Activities With a Profit Objective
The second issue *787 is whether petitioner's cutting horse activities were "engaged in for profit" within the meaning of section 183. Petitioner contends that he had an actual and honest objective of making a profit. Respondent argues to the contrary. Section 183(a) provides that "if * * * [an] activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Thus, a taxpayer must engage in an activity with an actual and honest objective of making a profit. See Dreicer v. Commissioner, 78 T.C. 642, 645-646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). If a taxpayer engages in an activity without a profit objective, deductions attributable to the activity are allowed only to the extent of the income derived from the activity. Sec. 183; Hager v. Commissioner, 76 T.C. 759, 781 (1981). The determination of whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all the facts and circumstances of each case. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), *788 affd. 722 F.2d 695 (11th Cir. 1984); Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to the objective facts than to the taxpayer's own statements of intent. Sec. 1.183-2(a), Income Tax Regs. The burden of proof is on the taxpayer to show that he or she engaged in an activity with the objective of realizing an economic profit. Rule 142(a). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors used in determining whether an activity is engaged in for profit. The regulation lists nine factors: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) *789 elements indicating personal pleasure or recreation. No single factor, nor the existence of even a majority of the factors, is controlling. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); see also Abramson v. Commissioner, 86 T.C. 360, 371 (1986). In applying these factors, the "courts have universally sought to ascertain the taxpayer's true intent." Dreicer v. Commissioner, supra at 645. The following discussion applies the nine factors to petitioner's cutting horse activities: Factor (1): Manner in Which the Taxpayer Carried On the Activity
Petitioner did not carry on his cutting horse activities in a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. He did not prepare a profit plan before entering into these activities, and did not undertake any consistent program of advertising his horses. Petitioner also did not maintain complete and accurate books and records on these activities. At trial he testified that he kept records of these activities, but that virtually *790 all of his records had been kept in storage and were destroyed by the storage facility management because he was unable to pay their fees (due to his bankruptcy). However, petitioner has not presented any corroborating evidence to substantiate this claim, and of course we are not bound to accept his self-serving testimony. See Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159. Factor (2): The Expertise of the Taxpayer or His Advisor
Petitioner has had an interest in horses for many years, and is an avid rider. However, his background and interest in horses are not necessarily synonymous with expertise in the cutting horse business. Petitioner did not make an extensive study of the profit potential of training or breeding cutting horses. While a formal market study is not required, his failure to make basic investigation of the factors that would affect profit is indicative of a lack of profit objective. Underwood v. Commissioner, T.C. Memo. 1989-625; Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). *791 Petitioner did not have the assistance of a competent staff. For example, he did not institute a regular training or breeding program conducted by qualified individuals. See sec. 1.183-2(b)(3), Income Tax Regs. In short, he has not established that his cutting horse activities were performed by persons with expertise in the cutting horse business. Factor (3): The Time and Effort Expended by the Taxpayer in Carrying On the Activity
During the years in issue, petitioner was engaged in the real estate business, both in his individual capacity and on behalf of Ross-McClain, and he pursued his cutting horse activities during his free time. While a taxpayer may devote a limited amount of time to an activity and still have a profit objective, for example, where the taxpayer employs competent and qualified persons to carry on the activity, sec. 1.183-2(b)(3), Income Tax Regs., petitioner has not established such facts in this case. He has not shown that he hired any skilled employees to assist him. He has not shown that he personally spent considerable time and effort on the cutting horse activities. Factor (4): The Expectation That Assets Used in the Activity May Appreciate *792 in Value
Petitioner has not presented any evidence that he had a realistic expectation that his cutting horses would increase in value. In fact, he testified that the value of his horses dropped during the period he owned the horses. It is clear that petitioner purchased some of his horses at or near their prime (for competition reasons), therefore decreasing the likelihood that their value would increase during his ownership. For example, he testified that he purchased Doc's Red Rattler as a "finished and trained" cutting mare, and that he sold her only a year or so later for the same amount he paid for her. Petitioner argues that he expected to make money from the sale of his horses' offspring. This assertion is not supported by the record. He has documented the sale of only one offspring, The Sister Peppy. However, he has not documented that his income from the breeding and sale of The Sister Peppy exceeded the attendant expenses. Neither has he documented any additional offspring (or the expectation of any additional offspring) from his horses. Finally, petitioner has not shown that he made any income from stud services, or that he expected to profit from this activity. *793 Petitioner did not establish that he made a serious effort to promote stud services, other than the one occasion when he advertised King Quixote. [5]
Factor (5): The Success of the Taxpayer in Carrying On Similar or Dissimilar Activities
Petitioner's cutting horse activities generated losses. Ross-McClain's cutting horse activities also generated losses. Petitioner entered into his real estate activities to make a profit, and he was successful. However, he did not apply the knowledge he acquired from operating a successful real estate business to his cutting horse activities. Factors (6) and (7): The Taxpayer's History of Income or Losses With Respect to the Activity *794 and The Amount of Occasional Profits, If Any, Which Were Earned
Petitioner had a history of losses from his cutting horse activities. He did not prepare a profit plan for these activities and, in fact, never showed a net profit from them. The occasional funds he received from these activities were de minimis compared to the expenses he incurred. Petitioner contends that, had he continued his cutting horse activities, they would have become profitable. He states that the economic downturn that ultimately led to his declaring bankruptcy interrupted this development of his cutting horse activities. See sec. 1.183-2(b)(6), Income Tax Regs. However, we are not convinced that petitioner was on such a track. He presented no evidence to substantiate that his continued losses were associated with customary business risks or reverses. Accordingly, we cannot agree with petitioner's contention that the economic downturn was responsible for the fact that he never showed a net profit from his cutting horse activities. Factor (8): The Financial Status of the Taxpayer
Petitioner had substantial income from his real estate operations during the years in issue. Based on the record, *795 it appears that he was financially capable of supporting his cutting horse losses. However, following the collapse of his real estate business, petitioner sold the majority of his cutting horse assets because he was no longer able to finance them. Factor (9): Elements of Personal Pleasure or Recreation
Based upon the facts before us, we conclude that petitioner engaged in his cutting horse activities primarily for recreation and personal pleasure. He grew up on a farm in a rural community, and he was an avid rider of horses. "The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit". See sec. 1.183-2(b)(9), Income Tax Regs. See also Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987), where the Court stated that a hobby or amusement diversion does not qualify as constituting a profit objective. After evaluating the facts in this case, we hold that petitioner's cutting horse activities were not organized and/or operated with an actual and honest objective of making a profit. Accordingly, we sustain respondent's determination on this issue. Issue 3. Constructive Dividends
*796 The third issue is whether expenses incurred by Ross-McClain constituted constructive dividends to petitioner. Petitioner admits that he received constructive dividends from Ross-McClain, but not to the extent determined by respondent. Respondent contends that the constructive dividends determined in the notice of deficiency should be upheld. Taxable income includes dividends received by shareholders from corporations. Secs. 301(c)(1), 61(a)(7). In determining whether there has been a constructive dividend, "the crucial concept * * * is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969). As a result, in a case such as this where petitioner and Ross-McClain were both engaged in the same activity, we must determine whether the corporate expenditures at issue were made primarily to benefit Ross-McClain or primarily for the personal benefit of petitioner. See Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1215-1217 (5th Cir. 1978). This issue presents a question of fact. See Lengsfield v. Commissioner, 241 F.2d 508, 510 (5th Cir. 1957), *797 affg. T.C. Memo. 1955-257. Petitioner has the burden of proof. Rule 142(a). Initially, petitioner entered into his cutting horse activities through his wholly owned corporation, Ross-McClain. Even after he began cutting horse activities in his individual capacity, petitioner's and Ross-McClain's operations were intertwined. Both petitioner and Ross-McClain made payments for expenses relating to the cutting horses. Petitioner trained and competed horses owned both by himself and Ross-McClain. We think Ross-McClain's cutting horse activities were engaged in primarily for the recreation and personal pleasure of petitioner. Thus, for all practical purposes, there was no distinction between the cutting horse activities of petitioner and Ross-McClain. Consequently, we view the expenditures of Ross-McClain on its cutting horse activities as being the personal expenses of petitioner, and therefore we regard them as corporate distributions. See, e.g., Greenspon v. Commissioner, 23 T.C. 138 (1954), affd. and revd. in part on another issue 229 F.2d 947 (8th Cir. 1956). In his opening brief, petitioner's *798 counsel stated that "there was some commingling of expenses between petitioner's cutting horse operation, and that of Ross-McClain * * * it is likewise admitted that, to the extent Ross-McClain paid expenses that should have been petitioners', the payment in theory represents a constructive dividend from Ross-McClain to petitioner." What remains for decision is the amount of these constructive dividends. The cutting horse activities of Ross-McClain were not consistently accounted for separately from those of petitioner. As opposed to the books and records of Ross-McClain's home construction business which were organized, accurate, and complete, those regarding the corporation's cutting horse activities were incomplete and disorganized. Due to the lack of records available to respondent, the amounts of expenditures actually paid by Ross-McClain were estimated. Petitioner has shown neither that respondent's determination was erroneous nor that Ross-McClain did not have sufficient earnings and profits. In fact, the corporate Federal income tax returns during the years in issue indicate that there were sufficient earnings and profits. Petitioner received an economic benefit with *799 respect to Ross-McClain's payment of his expenses for horse-related activities. These expenses were neither ordinary nor necessary business expenses, but rather reimbursement of petitioner's personal expenses. Accordingly, we sustain respondent's determination that the corporate payments constituted constructive dividends to petitioner, and are thus includable in his gross income for 1986 and 1987. Issue 4. Section 6653(a)(1)(A) and (B) Additions to Tax
The fourth issue is whether petitioner is liable for the additions to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a)(1)(A) and (B) for 1986 and 1987. Petitioner contends that he is not liable for these additions. Respondent argues to the contrary. Section 6653(a)(1)(A) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *800 Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed to be correct and petitioner has the burden of proving that it is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). On this record we hold that petitioner was negligent in 1986 and 1987. First, his purchase and sale of Wyndham I and II was part of his real estate business operations. He was knowledgeable in the area, and negligent in misclassifying the properties as capital assets. Second, petitioner engaged in his cutting horse activities primarily for recreational purposes. His deduction of excessive expenses for these activities shows a "lack of due care". Petitioner was also negligent in not reporting his constructive dividends. These amounts clearly conferred an economic benefit upon him. Hence petitioner negligently, or with an intentional disregard of the rules or regulations, misreported his income and expenses with regard to the issues decided herein. Petitioner argues that he relied on his accountant to report his income and expenses. A taxpayer may be insulated from liability *801 for a negligence addition by good faith reliance on professional advice. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). To be insulated, however, a taxpayer must have provided the agent with correct information, and the error must be due to the agent's mistake. Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Here petitioner has not established that his errors were due to his agent's mistake. To the contrary, he is a well-educated individual, with a background in both real estate and horses. He either knew or should have known that his return positions were erroneous and negligent. It also appears that petitioner did not fully disclose all of the relevant facts to his accountant to enable him to accurately prepare petitioner's joint returns. Thus, under the circumstances of this case, we do not believe that petitioner should be insulated from liability for the negligence additions because of his claimed reliance on his accountant's advice. We conclude that petitioner has failed to show that any part of the determined deficiencies was not due *802 to negligence or intentional disregard of the rules. We therefore sustain respondent's determinations with respect to the section 6653(a)(1)(A) and (B) additions to tax. Issue 5. Section 6661 Additions to Tax
The final issue is whether petitioner is liable for the addition to tax for substantial understatement of tax pursuant to section 6661 for 1986 and 1987. Petitioner contests this addition to tax. Respondent argues that the determined addition should be upheld. Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 501-502 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement is reduced if it is based on substantial authority or is adequately *803 disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). It is clear that petitioner's 1986 and 1987 understatements exceeded the minimal amount required for section 6661 to apply. Further, these understatements were neither based on substantial authority nor adequately disclosed on his joint Federal income tax returns or in a statement attached to the returns. We therefore sustain respondent's section 6661 determinations. To reflect concessions and our conclusions on the disputed issues, Decision will be entered under Rule 155. Footnotes
1. The joint notice of deficiency, dated June 8, 1990, is addressed to Kenneth R. and Christy M. Dunwoody. Mr. and Mrs. Dunwoody began divorce proceedings in 1989, and their divorce became final a few months prior to the trial of this case. Only Kenneth R. Dunwoody petitioned this Court for a redetermination of the deficiencies and additions to tax. "Where the deficiency or liability is determined against more than one person in the notice by the Commissioner, only such of those persons who shall duly act to bring a case shall be deemed a party or parties." Rule 60(a)(1); see also Rule 34(a). Thus, Kenneth R. Dunwoody is the only petitioner in this case. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code in effect for the years in issue.↩
2. The parties filed a Stipulation of Settled Issues at trial. These settled issues will be given effect in the Rule 155 computations.↩
3. A cutting horse is a quick, light saddle horse trained for use in separating cattle from a herd.↩
4. While the record is incomplete with regard to petitioner's activities concerning his other property purchases, we emphasize that petitioner bears the burden of proof on this issue under Rule 142(a)↩. He has provided no evidence to prove that he held these other properties as an investor or in any other nonbusiness capacity.
5. While petitioner did produce copies of two other advertisements that he placed involving his horses, as stated, he did not establish that he placed either of these advertisements more than once. In sum, we are unpersuaded that petitioner instituted a consistent and concentrated program of advertising for his cutting horse activities.↩